Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS

~~~~~~~~~~~~~~~~~~~~~

BASTIAN SOLUTIONS, INC.,

　　　　Plaintiff,

　　vs.　　　　　　Case No. 1:23-cv-00198-JRS-CSW

ATTABOTICS, INC.,

　　　　Defendant.

~~~~~~~~~~~~~~~~~~~~~

Video Deposition of

JASON JANET, PhD

Friday, June 28, 2024

8:58 a.m.

Taken via videoconference

Genevie Del Valle, Court Reporter

MR. PROCTOR-BROWN:  I'm directing him not to give you the -- the identity of the consulting experts that are protected under the federal rules.

Q.  When you say that you consulted with your colleagues, what do you mean?

A.  Well, I'm not sure how else to describe that, other than if I wanted a sanity check on a standard or a procedure, maybe how best to phrase something, that's what I mean.

Q.  Are you relying upon any of your colleagues for purposes of your opinions?

A.  No.  These are my opinions.

Q.  Did you need to work with any of your colleagues for purposes of the review of any of these materials?

A.  Which materials are you referring to?

Q.  All of the materials listed in Appendix A of your report.

A.  Oh.  This fits into the same vein of how I answered the previous question, and that is when I looked at some of the materials and I needed a sanity check, which could include anything from interpretation to, you know, how to best phrase my opinion, that's -- that would be the extent to

which I resorted to these consultants.

Q. Who -- who is Seth Nielson?

A. Pardon me?

Q. Who is Seth Nielson?

A. Seth Nielson is a software expert.

Q. He is one of the colleagues that you consulted?

A. He -- yes, he is.  He's a consultant.

Q. Did you bill Bastian for any of your colleague's time?

A. I did not personally bill for their time.

Q. Did they separately bill Bastian?

A. That's correct.

Q. Why did you reach out and work with Seth Nielson?

MR. PROCTOR-BROWN:  Objection. Work product.

Q. Are you going to refuse to answer that question?

A. I will follow the instructions of counsel.

Q. Okay.  You understand, Jason, if -- if we have to take this issue up with the court, I may have to call you back here.  I apologize.  I was hoping to complete your deposition in a single day.

A. That's fine.  I'm happy to -- happy to rejoin.

Q. How many other consultants who are your colleagues, in addition to Mr. Nielson, did you consult with?

A.  Probably just one other.

Q.  It was Mr. Nielson and one other person?

A.  I believe that's right.

Q.  Do you consider yourself skilled in expertise in software?

A.  Yes.

Q.  Why did you feel the need to consult with Mr. Nielson on software issues?

                    MR. PROCTOR-BROWN:  Objection.

        Work product.

Q.  Are you going to refuse to answer that, sir?

A.  Yeah, I'll follow the instruction of counsel.

Q.  In addition to your colleagues, did you work with anyone else in the preparation of your report?

A.  Just reviews with counsel.

Q.  Did you send drafts of your report to counsel?

A.  I'm sorry.  Did I cut anybody off?  Okay.

        Answer to your question is yes, I sent drafts.

Q.  How many drafts?

                    MR. PROCTOR-BROWN:  Objection.

        Work product.

A.  I really don't recall.

Q.  Do you know when you first sent a draft of your report to counsel?

Page 17

A. I don't really recall.

Q. Do you recall when you first had a draft of your report prepared?

A. Well, I also don't recall that exactly.

Q. Was it a matter of weeks or a matter of months before you submitted it on April 22nd?

MR. PROCTOR-BROWN:  Objection. Asked and answered.

A. Yeah, I don't recall.

Q. You simply have no idea whether it was weeks or months from the preparation of your first report to when you submitted it?

A. I -- I really don't recall.  It would probably be weeks for sure, but -- but I really don't recall.

Q. And, Jason, did counsel propose edits and revisions to your draft?

MR. PROCTOR-BROWN:  Objection. Work product.

Q. And do you intend to follow that instruction?

A. Yes.

Q. In addition to and outside of counsel for Bastian and your two colleagues, did you speak with any other persons to prepare your report?

A. I -- the names -- the name is not coming to mind, but -- but I believe an employee of Bastian, and

it might have been -- might have been a couple, but again, just to kind of get my bearings, my -- clarify my understanding.

Q. So you spoke with one or two employees of Bastian?

A. Yes, I believe so.

Q. Did one of those employees names -- was his first name Kyle?

A. Yes.

Q. Do you remember the other person's name?

A. I'm not sure if there was another person, other than maybe -- maybe their counsel, but Kyle's the only one I have with clarity.

Q. Okay.  What did you speak with Kyle about?

A. I think it related to roles and responsibilities for the -- the software on both the Bastian -- well, actually A360, Bastian, and Attabotics.

Q. Was your consultation with Kyle in connection with the preparation of your rebuttal report?

A. Yes, I believe I consulted with him for that.

Q. Am I correct that you did not speak with anyone, aside from your own colleagues and your -- and counsel for Bastian, in preparation of an April 22nd, 2024 report?

                    MR. PROCTOR-BROWN:  Objection.

Form.

A.   Yeah, I couldn't really follow that question.

Q.   So let me try it again.

For purposes of your preparation of the April 22nd, 2024 report that you submitted, am I correct that the only other people you consulted with or spoke to about your opinions were your two colleagues and counsel for Bastian?

MR. PROCTOR-BROWN:   Objection. Form.

A.   Well, you know -- counsel, should -- should I answer or should I not answer?

MR. PROCTOR-BROWN:   You can answer.

THE WITNESS:   Oh, okay.

A.   So I -- I believe that I've divulged to you who I utilized in helping with the draft of the reports.   And I'm not entirely sure how else to answer that question.

Q.   Did you conduct any interviews of A360 employees, Bastian employees, or Attabotics employees for purposes of preparing your April 22nd, 2024 report?

A.   I don't recall doing that, but I will say that I try to be a good steward of those sort of

records.  And so if I did, I would have made the effort to include that in the materials considered or resources considered or utilized. I can't exactly remember the section.

Q.  Am I generally correct, sir, that for purposes of preparing your April 22nd, 2024 report, you primarily did two things; you reviewed the materials set forth in Appendix A, and you performed a teardown inspection of an Attabotics robot?

A.  Yes, it certainly included those things.

Q.  Did I leave anything out?

A.  Sure.  Certainly, like I said, I try to make the effort to include that in reports.

                          -  -  -  -

        (Thereupon, Exhibit 117, Expert report of Jason Janet, PhD, was marked for purposes of identification.)

                          -  -  -  -

Q.  And we will get to your report, and it has already been marked as Exhibit 117 to your deposition.  You are free to pull up that report via Exhibit Share and take a look.

        But as for purposes of your testimony today, Jason, am I generally correct that the primary

tasks that you performed were reviewing the materials set forth in Appendix A and performing a teardown inspection of an Attabotics robot?

MR. PROCTOR-BROWN:  Objection.
Asked and answered.

A.  I would certainly rely on my expertise in the -- in this space as a person with my skill.  I believe that I made every reasonable effort to include the resources that I employed to draft the report and place that in, I believe you mentioned, Appendix A.  I'm still waiting for the document to come up.

Q.  Let me know when you've got it up in front of you.

A.  Just seems to be sort of a generating file preview.  It says it'll take a while.  It's just churning.  Is there a way to just download it?

Q.  Do you have a hard copy of your report in front of you, sir?

A.  I do.

Q.  You're welcome to review.  It's the same. Exhibit 117 is the 85-page -- excuse me -- 80 -- yeah, 85-page PDF of your April 22nd, 2024 report.  Let me -- do let me know whenever the image shows up on Exhibit Share.

page in front of me and ask me, did you review this page, even as I sit here today, I probably couldn't say definitively one way or the other the extent to which I reviewed that page.

But as I mentioned before, I reviewed the documents that I cited and I tried to get to the salient aspects of those references. And in some cases, that meant a more detailed review than in other cases.

Q.  How were you able to determine whether a document that is listed in Appendix A was salient if you didn't review it?

MR. PROCTOR-BROWN:  Objection. Misstates the witness' testimony.

You can answer if you can.

A.  Well, first of all, I think I explained I did review these. And second of all, as far as getting to the salient details, I provided an answer early on to this question, this line of question, where I would, first of all, see if it's duplicate information. There was a tremendous amount of duplicate information.

I would do word searches. I would look for patterns, graphs, and -- you know, there are probably other aspects that I would search for as

I'm, at a minimum, starting my scan, and then
drill down where it appeared to be more salient.

I'm sure there's more information that could
have been brought forth regarding this matter
and, you know, just simply wasn't yet.

Q. You testified at the beginning of the deposition
that you have spent in the tens of hours and it
may approach 100; is that right?

A. It might have even exceeded 100.  I don't really
recall.

Q. And included in that is your professed review of
the documents listed in Appendix A, correct?

A. Correct.

Q. Did you answer that, sir?

A. I did say correct.

Q. Okay.  Included in that time is also the
approximately two days that you spent performing
the teardown inspection, correct?

A. I spent approximately two days on site.  It might
have been -- yeah, it was around two days, the
equivalent of two days, on site.  Like I said, it
wasn't -- it wasn't all pulling things apart and
putting them back together.  There were some
other tasks that I performed while I was there.

Q. Were you reviewing documents while you were

Page 34

on-site?

A.   Yes.

Q.   Okay.  And included in that hour estimate is your personal drafting of your April 22nd, 2024 report; is that right?

A.   Yes, I believe so.

Q.   And also included in that estimate is your consultation with your colleagues and with Kyle; is that right?

A.   Yes.

Q.   And also included in that hour estimate is your preparation of the June rebuttal report; is that right?

A.   Sorry.  Say that last one again.

Q.   Also included in your hour estimate is your personal drafting of your June 2024 rebuttal report?

A.   No, we haven't covered -- as far as I'm aware, I didn't mean to answer any questions about the June rebuttal report.

Q.   You state here on your letter that you conducted an evaluation of images and videos from the installation facility.

       What images, sir?

A.   The images that are referenced in Appendix A.

Q.  Did you take those?

A.  I took -- there were several that I did not take.
    I don't -- I'm not excluding ones I did take.
    Because I did take quite a few pictures as well.

Q.  Were you ever on site at the Olathe, Kansas
    facility?

A.  No, I was not able to get on site at Olathe.

Q.  Were you retained after the site had been torn
    down?

A.  I'm not really sure what might have preceded
    that.  In fact, that might even be news to me
    that it was torn down.

Q.  Were you aware that the system that is the
    subject matter of this litigation has been
    removed from the Olathe, Kansas facility?

A.  Are you referring to the Attabotics aspect?

Q.  I'm referring to the entire material handling
    system installed by Bastian at the Olathe, Kansas
    facility.

A.  It's possible that I was informed of the extent
    to which things were removed or torn down, but I
    really don't recall those sort of details.
    Didn't really seem germane to -- to my analysis
    or my documentation.

Q.  Did you ever ask to visit the Olathe, Kansas

facility to review the material handling system that's the subject matter of this litigation?

A.    I believe that I did.  I -- again, I don't remember whether it was logistical issues or whether there just -- we just weren't allowed or I wasn't allowed.  But, you know, the next best thing for me was getting the videos, extensive amount of videos and pictures, some of which I referenced in my report.

Q.    And so as a result of that, Jason, you've never viewed the Attabotics Nest system that was installed at the A360 facility; is that right?

A.    I reviewed that in pictures and videos.

Q.    You've never touched it, you've never felt it, you've never personally viewed the Attabotics Nest system that was installed at Olathe, Kansas, right?

A.    I did not view it in person, that's correct.

Q.    Okay.  You have also never observed a working Attabotics ASRS system; is that right?

A.    In person?

Q.    Have you observed it in person or in video?

A.    I've seen them in video, yes.

Q.    Is that videos that you viewed off of Attabotics' website?

A.  Certainly off of Attabotics' website.  And I -- it seems to me that I would have -- it's possible that I viewed them outside of the website, perhaps YouTube videos, and I don't know that those are necessarily tied to the website.

Q.  Where did you conduct the teardown inspection of an -- of an Attabotics robot?

A.  That was in Indianapolis at counsel's office.

Q.  So you performed this teardown inspection in a law firm?

A.  Correct.

Q.  Did you select the robots that you were going to perform the teardown inspection of?

A.  Are you referring to the initial four-ish robots?

Q.  Correct.

A.  Those were the only ones I was aware of that were accessible.

Q.  Who selected those four robots?

A.  Not really sure.

Q.  Do you know where they came from?

A.  Well, my impression was that they came from the Olathe facility.

Q.  Did you ever verify that?

A.  I am reasonably confident that I verified that.

Q.  Do you know the names of the robots that you

Page 38

analyzed?

A.   I'd have to look at the pictures.  I took pictures that included, I believe, the names.

Q.   Do you understand, sir, that at some point, the material handling system at the Olathe, Kansas facility was shut down?

A.   My impression is at least the Attabotics aspect of that facility was shut down.

Q.   And do you understand that there was some period of time between the shut down of that facility and when you inspected the Attabotics robot?

A.   Could you repeat that question?

Q.   Do you understand that there were several months that passed between when the facility was shut down in Olathe, Kansas and when you inspected the Attabotics robot?

A.   I'm not sure if I can characterize the -- the time frame.  I understand that there was some time.  I believe I can go back and take a look here, but I believe that in my timeline I had my understanding of July 29th, 2022 as when A360 terminated the system agreement.

     But as far as the specific times when everything was shut down, I'm assuming that it was shut down then or slightly before.  And was

it ever fired up again?  I don't get the impression that it was.

Q.  And at some point, work ceased at the Olathe, Kansas facility.  And do you know where those robots were at the time of the shutdown that you inspected?

A.  I'm going to defer to counsel on the chain of custody of those robots.  I simply know that the robots were at the law firm when I arrived to do a teardown.

Q.  Did it matter to you whether those robots were functioning and working at the time of the shutdown?

A.  I would have loved to have seen the robots operational, but I feel that things would have only gotten worse for Attabotics if that was the case.  I would have been able to see more than just the -- the kind of poor quality assembly and design, despite the -- you know, the -- the laudable innovation.  But as far as a fielded system, things did not look good from an electromechanical standpoint.

I would have loved, like I said, to have seen the robots operational, but it's my understanding that that wasn't either allowed or possible.

Q.    We'll get into all of that later in your testimony, sir.

But my specific question is:  What did you do to verify that the robot you inspected was in good working order?

A.    Well, at a minimum, I look for damage, electromechanical damage.  And, you know, I'm -- I'm aware of ants falling and damage coming from that.  That's, you know, potentially a rather severe impact that would be, I would say, reasonably obvious between scuff marks and broken components that are external, you know, would be vulnerable to a fall like that -- or a landing, I should say.

And I made sure -- the one that -- the one that I tore down the most had no obvious blemishes, no obvious damage.  Aside from being able to see it when it's powered up, it looked as pristine as a -- maybe a beta unit would look.

Q.    Did you ask anyone where in the facility that robot was pulled from?

A.    I'm sure I asked.  I mean, the robots obviously were inside the Nest and outside the Nest in the repair queues and other places.  I'm speaking collectively.

Page 41

As far as those specimens, my understanding is that they were at some point operational, and when they were retained, that -- that they were known to be operational.

Q. So --

A. As operational as Attabotics got it, I should say.

Q. So let me ask the question again: Do you have a specific memory of asking someone that the robot you performed a teardown inspection of was operational at the time of the Olathe, Kansas shutdown?

A. I have a general memory of asking about that. And my understanding is that -- that at least the ones I focused on tearing apart were operational.

Q. Who did you ask?

A. I asked counsel.

Q. Did you do anything to verify that counsel's statement?

A. I trusted counsel.

Q. How were the robots shipped from Olathe, Kansas to Bastian's lawyers' law firm's office?

A. I'm not sure that I know how they were crated, although that the crates might have been in the same office does sort of ring a bell. And there

Page 42

were -- they were on dollies for -- it seemed to be some sort of a hand truck that was specifically adapted to support the ants.

Q. Do you have an approximation, sir, of the time frame between the shut down of the Olathe, Kansas facility in July of 2022 and the date of your teardown inspection?

A. I don't recall the exact date that I was at the firm for the -- the teardown. And as I mentioned before, I don't know the exact date or I don't recall the exact date of when everything was shut down.

Q. And I'm not --

A. Other than what's in my timeline.

Q. Yeah, I'm not asking for an exact date.

But what I am looking for is, what's your best approximation of when you performed the teardown inspection?

A. I would have to -- so we could figure this out a couple of different ways. One is the photographs that I took should have a timestamp on them, a date and timestamp on them. Then I'd probably have to take a look at my invoice and/or my travel arrangements to be sure.

I travel a fair amount. So hopefully you can

Page 43

understand that a lot of these things kind of blend together.

Q.   All right.  If you turn to Appendix D [sic] of your report, do you -- does any of these pictures help you place the date of your inspection?

A.   Which appendix did you say?

Q.   Appendix B of your report.

A.   B as in Bravo?

Q.   B as in Bravo.

A.   When I say look at the pictures, I mean electronically there would be a date timestamp.

Q.   Do you have those pictures with you today, sir?

A.   I could probably dig them up from a folder.

Q.   Do you have --

A.   Do you want me to do that?

Q.   Sure.  Or if you have your time entry reports with you today, you can look there as well.

MR. PROCTOR-BROWN:  We're at almost an hour.  Can I take a break now and we can find that date for you?

MR. ALBAUGH:  I'm happy to take a break.

MR. PROCTOR-BROWN:  Thanks.

THE VIDEOGRAPHER:  Okay.  This is the videographer.  We're going off the

Page 44

record at 9:55.  We're off the record.

- - - -

(Thereupon, a recess was had.)

- - - -

THE VIDEOGRAPHER:  This is the videographer.  We are back on the record. It is 10:03.

You may proceed.  Thank you.

BY MR. ALBAUGH:

Q.  All right.  Jason, we have taken a quick break. And during that break, I believe you reviewed some documents; is that right?

A.  Oh, I looked at the -- the date stamp on one of the pictures that I took.

Q.  And what was that date stamp?

A.  Well, the date stamp says 6th of March.

Q.  Of 2024?

A.  Of 2024, yes.

Q.  Do you believe that the robot that you inspected was used or in any way operated between July of 2022 and March of 2024?

MR. PROCTOR-BROWN:  Objection. Form.

You can answer.

A.  As I mentioned before, I -- I don't have details

Page 45

about the chain of custody or the -- the use.  I don't have those sort of details.

Q.  Does that matter to you?

A.  Well, it matters to me, but I trust counsel. Counsel wouldn't -- they've been very transparent with me and I have no reason to believe that they would have put something that was intentionally damaged or rigged or in any way problematic that -- you know, of their own doing.

It's my understanding that these were moved from the facility via an acceptable transportation means, i.e., like a truck, and that they weren't used or in any way modified before I saw them.

Q.  And those are just assumptions which you're making, correct?

MR. PROCTOR-BROWN:  Objection. Misstates his testimony.

A.  Well, on top of that, counsel, I couldn't really hear you very well.  You might be a little distant from your microphone again.

Q.  When you say that you assumed that they were moved from the facility via an acceptable transport and not used or altered, you're making an assumption; is that right?

MR. PROCTOR-BROWN:  Objection. Misstates his testimony.

A.   Well, I know I used -- well, if what you read back to me or restated to me is accurate, I might have used the word "assumed."  I trusted that they were.

Q.   What did you do to verify that fact?

A.   I consulted with counsel.  I asked.

Q.   What did you ask him?

A.   I asked if -- first of all, I asked where they came from.  And I asked if anything was -- well, I first asked if there was a way for me to power it up, and they said that they didn't have a way of doing that.  And so then that sort of defeated the need for the next question, which is, did you power it up or did you operate it, but I asked it anyway and the answer was no.

Q.   Did you ask them where the robots had been stored for the approximately 20 months?

A.   My recollection was that they were at the Olathe facility and then at the law firm.  I don't know if there was an intermediate point, but that's my recollection.

Q.   Did you ask that question and that's the information you received in response?

A.  My recollection was that I asked that question, where did they come from, and, you know, I was told the Olathe facility.  And I didn't have any reason to doubt that and that they were brought over by truck.  That's my recollection.

Q.  Does it have any impact on your inspection, Jason, that these robots had been sitting and unused between July of 2022 and March of 2024?

A.  No.

Q.  Why not?

A.  Because what was inspected were electromechanical components that were not powered up.  And from my inspection, they did not appear altered.  They just appeared to have been used, and more specifically, used either at the Olathe facility or someplace prior to that.

Q.  So is it your testimony, Jason, that you do not know whether the robot you inspected was used at the Olathe facility?

            MR. PROCTOR-BROWN:  Objection.
      Misstates his testimony.

A.  I'm reasonably sure I just said that it's my understanding that those came from the Olathe facility, were used there.

Q.  Well, your prior answer was had either been used

there or at another facility.

A. I said or a prior facility.

Q. Hence my question to you, you do not know, as you sit here today, whether the robot you inspected had been used and operated at the Olathe facility versus been present at the Olathe facility and used at some other facility; is that right?

MR. PROCTOR-BROWN: Objection. Misstates his testimony.

A. I see the nature of your question and let's kind of set this straight. So my understanding is that they were used at the Olathe facility.

It's also my understanding that they were also used some other place prior, whether it's the Nordstrom facility or -- and/or at the Attabotics facility, but they were also used at the Olathe facility, and used at the Olathe facility most recently before I had the opportunity to do a teardown.

Q. What did you do to verify that the robot you inspected had, in fact, been used and operated at the Olathe, Kansas facility?

MR. PROCTOR-BROWN: Objection. Asked and answered multiple times.

You can answer again.

Page 49

A.  Okay.  Well, first of all, I asked counsel.  I would probably have to go back and dig up more details about, you know, seeing some of the same robots that I looked at in pictures and/or video from the Olathe facility as well to just, you know, further, I guess, galvanize that that's the -- you know, those are reliable sources of information.

Q.  And I'm trying to understand.  I will accept that counsel likely provided you with robots that had been present at the Olathe, Kansas facility.

A.  Uh-huh.

Q.  How did you verify that that robot that was removed from the Olathe, Kansas facility and taken to the law firm's office -- how did you verify that that robot had actually been used there?

A.  As I mentioned before, I asked counsel if they came from the Olathe facility.  If you're seeking further clarification as to whether they were used, meaning just because they were there, maybe they weren't used, then, yes, I asked the same question, were they used, were they in operation, did they come from the Olathe facility.

Q.  And did the counsel respond to you that they had,

Page 50

in fact, been operated at the Olathe facility?

A.   Yes, that's my recollection.

Q.   Do you know whether the robots that you reviewed were inside of the Nest at the time of the shutdown?

A.   I don't know what the roster looked like at the actual time of shutdown.

Q.   Do you know whether the robot that you inspected was outside of the Nest at the time of the shutdown?

A.   At the actual time of shutdown, as I just mentioned, I don't know what the roster was of -- of the ants that were inside the Nest versus outside, perhaps waiting for repairs or waiting to be pulled from reserve.

Q.   Okay.  And so you do not know, as you sit here today, Jason, whether the -- the robot that you inspected was inside the Nest, outside the Nest, or located in the pen next to the Nest?

A.   At the point of shutdown?

Q.   Correct.

A.   I don't recall that.  You know what?  I -- but it does bring up an interesting question.  I would love to see detailed reports about each one of these robots, each one of these ants as they were

Page 51

used.

I make reference to that in my report, that there seemed to be some information that was withheld specific to how each of these ants was operated, their maintenance regimen, repair records, that sort of thing.  I'd love to see that.  I'm glad you brought that up.  Is it possible for me to see that?

Q.  I'm the one who gets to ask questions today.

A.  Well --

Q.  I want to repeat -- I want to repeat my question to you, Jason.

As we sit here today, it's your testimony that you do not know whether the robot that you inspected was at the time of the Olathe, Kansas facility shutdown inside the Nest, outside the Nest, or in the Attabotics cage next to the Nest; is that right?

MR. PROCTOR-BROWN:  Objection.

Asked and answered.

You can answer again.

A.  In the absence of information that I had just mentioned I would love to see, which is to say specific records of the operational profiles for each one of these robots.  I would love to see

that, and I would love to see the repair records and any other incidents associated with each of these robots.

Without that information, which I'm reasonably sure was requested, then I couldn't tell you exactly where each one of those robots was at the time of shutdown.

Q. Okay. That's a long windup to a confirmation that you do not know where the robot was located at the time of the shutdown; is that right, Jason?

MR. PROCTOR-BROWN: Objection. Asked and answered.

A. I'll answer it the same way. I mean, you know, if you're looking for a yes, no, you're not going to get that on this.

Specifically, I do not have records of the exact profile for each one of these robots. I've asked for it. I would love to see it. In the absence of that information, operational profiles, incident reports, repair regimen, etcetera, etcetera, maintenance records, I couldn't tell you exactly where each of those robots was at the time of shutdown.

Q. All right. I think you answered that question.

Page 65

Misstates his testimony.

You can answer.

A.  Yeah, I -- anything that I received from counsel would have been very high-level information and everything would have been cross-referenced with the documents.  So at a minimum, the foundation for those is the documents that were provided and I reviewed.

Q.  Does your opinion about the ASRS system that's subject in this lawsuit include the Nest?

A.  It certainly includes aspects of the Nest based on information that I was able to receive.  As you might notice, I requested or would have loved to have seen, as far as I'm aware it was never made available, things like Hivemind and, you know, other specific logs of the -- the system itself and each of the ants.

Q.  Your opinion, I believe, covers the -- the Attabotics ants; is that correct?

A.  It includes the ants, correct.  Based on --

Q.  Is --

A.  Based on the information that was provided to me, correct.

Q.  Does your opinion cover the ASRS systems pick stations?

Page 66

A.   The pick stations are included from an operational perspective, and they're referenced in a couple of places.  Again, this is in my report.

Q.   Did it also include the Nexus software?

A.   The Nexus software for this report and I think in high-level terms didn't really have the code until a few days ago or I guess a few days before the rebuttal report was submitted.  I believe that we requested it, but didn't receive it until then.

Q.   Jason, am I correct that you are not opining on the, quote, large scale materially -- material handling system at the Olathe facility that Bastian designed and deployed?

              MR. PROCTOR-BROWN:  Objection. Misstates the testimony in the report.

A.   It's my recollection -- and, again, we can go through the report in detail, that I provide observations based on the images and video recordings about the broader facility, at least that was made visible to me through those media.

Q.   Well, are you opining as to the functionality of A360's D365 software?

              THE WITNESS:  Did you hear him?

Page 67

MR. PROCTOR-BROWN:  Matt,
there's --

THE WITNESS:  Okay.  Uh-huh.

MR. PROCTOR-BROWN:  Matt, there is
-- there's definitely a microphone issue.

A.  I'll turn my volume up, but it's, like, at 96
right now.  Could you ask that again?

Q.  Yes.  Are you not opining on A360's D365 software
functionality?

MR. PROCTOR-BROWN:  Objection.
Form.  Misstates the report.

A.  I -- with respect, counsel, I'm going to defer to
my report.  It's -- it's possible I -- I would
almost say probable that I discussed the D365
software, the extent to which I do and, you know,
what constitutes an opinion, I think we probably
should look at it on a detail by detail basis.

Q.  Let me ask:  Did you review the D365 software
code?

A.  I did not look at the D365 software code.

Q.  Did you perform any analysis of D365 software?

A.  The analysis that I performed of the D365
software was -- if I'm remembering correctly,
and, again, I defer -- every response that I'm
giving to you I'm deferring to my report to

clarify and set the record straight.  But my recollection was looking at records of how it interacted with the systems that it had to interface with.

Q.   Did you analyze how D365 software was integrated with Attabotics' Nexus software?

A.   Again, I refer to what's in my report there.  I'm reasonably sure that I looked at the interoperability.

MR. PROCTOR-BROWN:  This is late, but I will object to the form of that question.  I believe it misstates the testimony -- the -- the record in this case.

Q.   How did you look at the interoperability between D365 and Nexus?

A.   Well, at -- at a minimum, as I mentioned before, I referred to records and I referred to testimony.  And they informed me of how the, I would say, three major software systems were set up to be interoperable.  And I have a diagram of that, I believe, on page 16.

You can see, for example -- and I'm not saying this is the only place that I talk about it.  But the -- you've got the D365 at the top,

in the middle, in the dash box would be Bastian,
and at the bottom would be Attabotics.

Q. Did you perform any analysis of the Exacta
software code?

MR. PROCTOR-BROWN:  Object to
form.

A. I do not believe I looked at the Exacta code,
but, again, the analysis was in the performance
and the testimony where the Exacta -- the Exacta
-- the expectations for Exacta in terms of
interfacing with Attabotics was described in the
FSDs and -- and then tweaked to accommodate the
shortfalls of the Attabotics Nexus software.

Q. Jason, did you ever perform an inspection of
Bastian's lidding machine that was part of the
material handling system at Olathe, Kansas?

A. To the extent that I describe it in my report
where it was alleged to be a source of problems.
And, again, we can go to that section.

Q. And how did you inspect the lidding machines that
were physically present at Olathe, Kansas?

MR. PROCTOR-BROWN:  Objection.
Form.  Misstates testimony.

Q. Did you hear my question, Jason?

A. I did.  I'm trying to get my bearings by looking

Page 70

at my report, which you're welcome to do as well.

So if you'll notice page 54, Section 7.3.3, lidding, light curtain, and project management, I refer to the 2023, October 30th Attabotics' answers and objections to Bastian's first set of interrogatories. And then I also talk about the documents that I reviewed that describe Bastian's reputation.

In between, I explain that the -- the alleged issues were not serious. They did not render the system unable to operate or perform as required.

Further, my understanding about the alleged lidding and document insertion machine faults is that the lidding machine had glue gun seizures due to low volume, which would go away with standard operation, that remained unrealized due to Attabotics's acceptance test failures and overall downtime.

Q. Did you perform a teardown inspection of the lidding machine comparable to what you performed of the Attabotics' robots?

A. No, sir.

Q. Why not?

A. It wasn't available to me. I think lidding machines are rather ubiquitous and they're fairly

well-known.  And -- and more specifically, the problem that was described was a -- it's a well-known problem.  If -- if an operation is not maintained at a certain tempo, the glue in the guns, the adhesives, can tend to seize up.  And it just seems like -- you know, my impression was that -- that the glue guns, as I mentioned before, had seizures.  That's a well-known problem.

Q.  Did you perform a teardown inspection of the printers and label makers that --

A.  I did not.

Q.  You did not.

Did you conduct a teardown inspection of the tray formers, Jason?

A.  I did not.

Q.  Those were also not available to you?

A.  I don't recall them being available to me.  I certainly -- if I'd had the option, I would have looked more into it, but you're referring to pretty standard components.

The only thing that's kind of unique about this system for Attabotics is the ant and all of its intended functionality, and then the low-level through high-level software that drives

Page 72

the ant and the -- and the ant system.

Q.  Okay.  And you also did not perform a teardown inspection of the document server that was part of the material handling system at Olathe, Kansas; that's right?

A.  That's correct, yes.

Q.  You would -- you would have liked to have physically inspected the lidding machine, the printers, the label makers, the tray formers, and the document inserters, but those were not available to you?

MR. PROCTOR-BROWN:  Objection.  Form.  Misstates the testimony.

A.  Yeah, the -- you know, I just like tearing things down and seeing how they work, and there's a point of pride being able to put them back together and that they work again.  But that's outside the scope of what I would need to do in this situation because, first of all, those are systems that are pretty well-known in the industry and you can buy off the shelf and have installed.

What's different here, and this is where I focused, is the ant and the ant Nest and the software that drove from the low level, the ants

Asked and answered.  And it also misstates the testimony, Matt.

A.  I did not see it live, but I did see it in videos and pictures.

Q.  Did you ever perform any tests to observe how Attabotics' system interacted with and functioned with Nexus, Exacta, and D365 software?

MR. PROCTOR-BROWN:  Objection.  Misstates the record in this case.

A.  I -- I did not have the operational software to -- to exhaustively or, you know -- or run simulations.  I just simply responded to allegations by Attabotics about, for example, supposedly, you know, poor handshaking or something to that effect and was able to form my opinions based on the materials that I referenced.

Q.  Jason, did you utilize any scientific method in reaching your opinions in this case?

A.  Absolutely.

Q.  What are those scientific methods?

A.  Well, you -- much like you would refer to case law, I would refer to industry standards.  These are industry standards that I've been exposed to and conformed to and, you know, I even helped

form in certain cases throughout 20-some-odd years or more in the ASRS and just overall technology space.  So that's -- that's one, making sure that there are reliable references to -- to shape my perspective and interpretation.

There's also just hands-on experience.  Then there's looking at written and deposition testimony, reviewing the documents that were provided to me, trying to square timelines, which I summarized in the back of my report, with events.

And then mathematical analyses, for example, the impact of let's just say an ant going down within one of the vertical shafts or a variety of other things.  But these are in my report.

Q.  Jason, using your scientific method, could someone test your conclusions and opinions?

MR. PROCTOR-BROWN:  Objection.

Form.  Who -- who's the "someone" in that sentence, Matt?

A.  I welcome anybody to repeat my methods and I am extremely sure that they will arrive at the same conclusions.  And, to me, that's the epitome of the scientific method is, is there repeatability?

Now, do you have additional data that I

didn't have that might shape or form somebody else's opinion or, you know, differently?  Well, that's possible.  You know, for example, Dr. Dew (phonetic) seemed to have access to code that we didn't have access to for the longest time, despite requests.

Could she have arrived at a different conclusion?  Sure.  Of course, for the opinions she put forth in her report, the -- her analysis was refuted on the basis of a variety of other things.

Q.  Jason, do you think that someone could take your work product and opinions, test those opinions, and either confirm or refuse them through experimentation?

MR. PROCTOR-BROWN:  Objection. Form.  Vague.

A.  If the experimentation is the exact same -- exact same data or circumstances for the data that I received, then yes.  But, you know, I mean, what's kind of interesting about this question is Attabotics had numerous opportunities to run these tests, these experiments, and I -- I can't see a bigger runway accommodated to anybody.  I would have not provided that, that's for sure.  I

would have cut this contract a lot sooner.

But there are tests that are documented by Attabotics. And so then the question is, I think, fair to ask: What more experiments do you need? You have the data from your own experiments and they -- they didn't bode well.

Q. When I talk about your opinions and your methodology --

A. Right.

Q. -- aside from looking at and tearing down one robot, the entirety of what you did, Jason, was simply review documents in this case; isn't that right?

MR. PROCTOR-BROWN: Objection. Misstates his testimony and the report.

A. And I want to be -- I want to explain something here. You're trying to minimize my teardown of one robot, but if Attabotics was worth its salt, one robot would represent all robots.

If they were delivering anything that was functional, repeatable, and conformal to any sort of reasonable industry standard in this purchase order, one robot would have represented every single robot.

Q. Let me ask my question again.

Jason, isn't it true that aside from one teardown of an Attabotics robot, the entirety of what you did in this case is review documents and arrive upon your opinions about what those documents say; isn't that right?

MR. PROCTOR-BROWN:  Objection.

Asked and answered.  And I renew my other objections that that mischaracterizes his testimony and report.

But you can answer again.

THE WITNESS:  Thank you.

A.  I'm going to repeat what I said.  One robot from a company that claims to be delivering production-grade robots, one robot would have represented all of the robots in a teardown.

In addition to that teardown, I acknowledge I reviewed documents, and I reviewed in those documents testimony, there were videos, for example.  There were images and there was a statement of work.  There was the functional -- the FSD and a variety of other documents.

There was also a conversation with at least, as I mentioned before, one -- I'm sorry -- one Bastian employee.

Now, it's also possible that there was more

to that, but I defer to my report and the materials reviewed or considered.

Q. Let's go back to your report, Jason, and I'm on page 5.  Are you there?

A. Yes.

Q. Look at paragraph 5.  Are you there?

A. Yes.

Q. You begin that statement by saying, "This report provides my assessment to date," and then continues.

Do you that sentence?

A. Yes, sir.

Q. Are you continuing with any of your assessments?

A. Am I continuing with any of my assessments?

MR. PROCTOR-BROWN:  I'll object to form.  Vague as to time.  You read a report from April, Matt.  He's issued another report.

Q. Do you plan to continue your assessment between now and trial, Jason?

A. Oh, if given the opportunity, I will.  If allowable, I will.  I think there's potentially -- and I would love to see, as I mentioned before, Hivemind, you know, a couple of other things that I mentioned that seemed to be

missing that might inform somebody, such as myself, as to the well-being and performance, maintenance logs, repair logs, failure mode, etcetera, etcetera that wasn't provided.

So, for example, on Section 6.1, page 46 of my April report, I -- I mentioned that Smartsheet and Hivemind appear to be Attabotics' error logging databases, and while I acknowledge the possibility of overlooking any of that, as far as I'm aware, I don't see them.

I don't recall being -- I don't recall having access to them.  And I believe that that information would be very informative before going to trial.

So given the opportunity to review that and other things, yes, I absolutely welcome the opportunity for more assessment.

Q.  Aside from those items that you listed, do you have current plans to continue your assessment?

MR. PROCTOR-BROWN:  Objection. Form.  Vague.

A.  I'll do whatever I'm allowed to do.  I -- this -- you know, I feel like this is pretty convincing already, but I also feel like there were -- there were a lot of things that certainly weren't

describes these incidents and their root causes, then I welcome that. I asked for it. But in the absence of that information, I can simply go by, you know, the testimony and -- and the -- the specs and these FSDs, for example, and the performance.

Q. Did you ask Bastian for the source code for Exacta?

MR. PROCTOR-BROWN: Objection. That's work product and asks for a privileged communication.

Q. At any time, have you had access to the Exacta source code?

A. Pardon me?

Q. At any time, sir, have you had access to the Exacta source code?

A. I believe I would have cited that if I utilized it or had access to it to utilize it.

Q. And since it's not listed on Appendix A, you do not have access to Exacta source code?

A. If it's not listed in Appendix A, either -- either it was an access issue or just not deemed as necessary given all of the other information.

Q. I want you to jump forward to paragraph 109 of your report on page 54. Do you see that?

A.   Yes.

Q.   You state in this paragraph, quote, "Based on the numerous documents I reviewed as part of this matter, my opinion is that Bastian's project management not only has a phenomenal reputation given the aforementioned 100-plus installations, but also given the meticulous and tactful nature of their engagement with Attabotics."

     I don't believe there's a verb in that sentence, but I want to -- I want to ask you specifically about what is your opinion of Bastian's project management of the A360 system?

               MR. PROCTOR-BROWN:  "Is" is a
          verb, Matt.

A.   I was just going to say "is" seems to be a verb.

Q.   Do you -- do you agree that there's a grammatical issue with that sentence?

A.   "My opinion is."

Q.   Your opinion is what?  Read it.

A.   "My opinion is that Bastian's project management not only has a phenomenal reputation given the aforementioned 100-plus installations, but also given the meticulous and tactful nature of their engagement with Attabotics."

     My opinion is that Bastian's project

management is phenomenal and has this great reputation.  And it's based on two things -- at least two things:  The 100-plus installations and the meticulous and tactful -- tactful nature of their engagement with Attabotics.

Q.  Sir, did you review any documents where A360 leadership criticized Bastian's project management?

A.  I -- I don't recall something like that, but, you know, it's -- it's -- you going to show me?

Q.  Based upon your experience, sir, is it normal for a customer like A360 to ask an integrator like Bastian to remove its project manager?

MR. PROCTOR-BROWN:  Objection. Form.  Foundation.  Assumes facts not in evidence.  You know that didn't happen, Matt, and you have an incomplete hypothetical about some mythical other organization.

You can answer if you can.

A.  I'm not aware of anything like that, and you know what, I -- I imagine this -- this situation as it's uncurling only because I've -- I've been in these installations several times -- I mean these types of installations several times.

Page 190

What's clear to me is that -- is that Bastian was clearly trying to cover for Attabotics in trying to help it become successful and help this overall project become successful.  And -- and it looks like they took the heed as a result of that, covering for Attabotics, you know, indulging, agreeing to expand the scope of what they were doing to help both parties overcome the -- the failings of the Nest and the ants.  That a customer would be upset and perhaps not direct that -- that ire to the exact party is entirely possible.

I can see where anybody, any customer would get frustrated with delays that I see that emanated from the Attabotics installation.

Q.  Sir, did you review A360's corporate representative's deposition?

A.  Well, if I did, it would be in my -- I have to defer to the Appendix A, I believe.  Are you referring to anything in particular?

Q.  It's listed at number 125 on Appendix A.

A.  Okay.  Oh, Mark Davison.

Q.  Did you review that deposition transcript?

A.  Yes, I believe so.  That's why I put it in here.

Q.  And do you recall his testimony about Chuck Rowe,

the project manager for Bastian?

MR. PROCTOR-BROWN:  Form. Foundation.  If you want to put in front of him a piece of transcript -- deposition transcript, go ahead.  And if you want to offer it to prove up your statement about what Mr. Davison said, I'm happy to review it.

But I think you're making false representations about documents in this case, Matt, on this particular issue and I'm not going to allow you to ask incomplete hypotheticals based on that false representation.

MR. ALBAUGH:  You may state your objections for the record.  I would ask that you stop providing speaking objections like this.

MR. PROCTOR-BROWN:  Well, I'm going to continue to reiterate when I think that you're misrepresenting a document to the witness.  And I think you're doing that right now.

If you want to offer some proof that are you are not, I'm happy to review

Page 192

it and we can talk about it at a break or we can talk to the court.  But it's -- I think it's entirely improper to misrepresent a deposition transcript like that and not confront him with a piece of the transcript itself.

MR. ALBAUGH:  Mr. Proctor-Brown, were you present at Mr. Davison's deposition?

MR. PROCTOR-BROWN:  Mr. Albaugh, I was not, but I have seen the summaries and I have looked at the deposition transcript itself.  If you want to direct me and the witness to a piece of that testimony, feel free to do so.

MR. ALBAUGH:  I will cite to you after this deposition is over exactly what I'm referring to, but please understand that your objections and your assertions that I am misrepresenting what Mr. Davison said are completely false.

MR. PROCTOR-BROWN:  I don't think that's true.  And if they -- if they were unfounded, send it to me right now and I won't make the objection and you can show

Page 193

it to the witness.

But asking him about a couple hundred-page deposition transcript without showing it to him is improper.  But go ahead.

A.    Will you furnish us with that document, counsel?

Q.    As you sit here today, sir, do you have any understanding that A360 asked Bastian to remove Chuck Rowe as the project manager of this project?

MR. PROCTOR-BROWN:  Object to form.  Foundation.  And I think you're assuming facts not in evidence and I'd ask you to provide an offer of proof that they said that.

MR. ALBAUGH:  Your objection is noted.  Now I would like an answer to the question.

MR. PROCTOR-BROWN:  You can answer if you can.

A.    I -- I -- you know, I -- I can't -- you said this isn't a memory test.  It seems to me that you have this document.  You can put this up right now and I can answer it.  In the absence of that, it's a -- it's a memory test, possibly a

Page 194

hypothetical.

Q. I'd like to push you forward to page 60 of your report, and I want to specifically ask you questions about 9.12 and 9.13.

A. Okay.

Q. With regard to 9.12 photos, you list OF Olathe facility photos July 2023.

What are those photos?

A. Too many to list, but there's a -- there's a clump of photographs and videos that were taken of the Olathe facility that included the -- the ants and the Nest. And, actually, I have several of them. It's obviously a very small sampling of them in my report.

So, for example -- so, for example, the checklist for ants in triage, including the failures and Smartsheet recordings -- recording issues in Hivemind, that picture came from that cluster of photographs, which is to say that there's a picture of a piece of paper that provides a procedure.

It's hard for me to read on this printout, but basically it's a process where incidents are reported into Hivemind and Smartsheet. I have a couple of other pictures that came from that

cluster, including the robots in the queue waiting to be repaired.

Figure 6 shows three of those photographs from that cluster.  Figure 5 shows the V4 parts list on an image from that cluster.  Figure 4 shows the Attabotics V4 ant drives and sensor layout from that cluster.  At least one of the -- one of the images from Figure 1, I believe, is from that cluster, but I think actually all four of those are.  So these came from the referred-to cluster of pictures.

Q.  What does the "OF" before the Olathe facility photos stand for?

A.  OF, I -- OF, I believe, was the Olathe facility.

Q.  Do you know who took those photos?

A.  I don't really recall off the top of my head who would have taken those pictures, but they didn't appear to be doctored.

Q.  And it's your position that those were taken in July of 2023?

A.  That -- that appears to be my understanding of that cluster of those pictures, but I don't know when exactly they were taken.  I can probably bring them up and see if there's, like, a date stamp on them, assuming that the date stamp

corresponds to when they were actually taken versus treated as a file somewhere.

Q.  Okay.  I might ask you to do that at a break.

A.  Sure.  I don't really want to do that on a break. We can do that on the clock.

Q.  Sure.  If you want to -- if you want to take a second right now and pull those up and find out what the date stamp on them is, that's fine.

A.  Okay.  Let me see if I can find them here.

Q.  Okay.

A.  So I'm looking at photograph -- the file name is NLS_0001, so November, Lima, Sierra, underscore 0001.  And it looks like, at least according to this, it says it was created April 4th, 2023, at 8:19 a.m.

Now, again, that may be because that's when it was saved to a folder.  It's also very possible that that was -- it could have been taken before that time -- or before that date, I should say.

Q.  I was -- I was present when those photos were taken on April 4th.  So I want to make sure there were not a separate set of photos or something else did not happen at that facility, given -- given your designation of July 2023.

A.   Yeah, that seems to be the case.  I can look at more photographs, but, you know, that one sample gives at least one date.

Q.   Okay.  Are you looking at a directory right now?

A.   I just closed it.  You want me to open it back up?

Q.   If it's not too much trouble.

A.   Okay.  I have it open.

Q.   Are the other photos that you can see in the directory also dated April 4th of 2023?

A.   Well, let me just take a look at how many photos there are here.  It looks like there's a lot. 395 photos, or at least files.  So if you want, I can sample a couple of others to give you a date.

Q.   Sure.  Just give me a couple -- a couple more dates.

A.   Okay.  So November, Lima, Sierra 0238.  The date is April 4th, 2023, at 10:49 a.m.

Q.   Okay.

A.   Let's see.  I'm trying to find one that Attabotics says -- November, Lima, Sierra 0370, the date is April 4th, 2023, at 11:50 a.m. and 42 seconds.

Q.   Okay.  That's sufficient.  Thank you for doing that.  I appreciate it.