**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

BASTIAN SOLUTIONS, LLC,                )
                                       )
                    Plaintiff,         )
                                       )
vs.                                    )
                                       )    Case No.: 1:23-cv-00198-JRS-CSW
ATTABOTICS, INC.,                      )
                                       )
                    Defendant.         )

<u>**PLAINTIFF BASTIAN SOLUTIONS, LLC'S REPLY IN SUPPORT OF ITS**</u>
<u>**MOTION TO EXCLUDE DR. WINNCY DU**</u>

Attabotics, Inc.'s ("Attabotics") Response (Dkt. 123) is an exercise in distraction from the

fundamental reality that Dr. Du's proposed expert testimony is deeply flawed and unreliable. Two

examples illustrate the point. First, Dr. Du seeks to opine that Attabotics' products were

"industrial-grade" and met unspecified "industry standards" (Dkt. 116-1, at 10, 13), but Dr. Du

has never worked in industry; she has spent her entire career in academia, mostly running a lab

(*id.* at 20). Her opinion that Attabotics' system was an "industrial-grade system, not a prototype"

is based only on her subjective judgment that it has a "professional look." (*Id.* at 10). Attabotics'

own CEO told the world she is wrong: Attabotics' first commercialized product was not introduced

until August 2022. (Dkt. 128-2). And the only "standard" Dr. Du cites is an inapplicable safety

requirement, as Dr. Janét (a recognized industry expert with academic experience) says in his

rebuttal report. (Dkt. 128-1 at 31–32).

Second, Dr. Du's opinion about Attabotics' software is outside her expertise, lacks any

methodology, and is irrelevant to this case—not to mention based on information improperly

withheld from Bastian by Attabotics. The closest Attabotics comes to linking Dr. Du's knowledge

and experience to her software opinions is the bald assertion, "She is qualified to opine on the

1

code[.]" (Dkt. 123 at 6). Attabotics is similarly brazen when it argues Dr. Du "conduct[ed] an extensive examination of Attabotics' … software" (*id.* at 5), when all Dr. Du did was read nearly 15,000 pages of code—in a non-working .pdf—over the course of 63 hours, while also writing her report. (*See* Dkt. 119 at 16–18). Even Attabotics' own unsupported assertions show the code Dr. Du analyzed was only in use for (at most) *five business days* before the final catastrophic test on July 21, 2022. (*Compare* Dkt. 123-3 at 13 (alleging without support the code was deployed on July 14, 2022) *with* Dkt. 123 at 12 (screenshot dated July 21, 2022, the day of the last test)). The version of the code Dr. Du reviewed is in no way relevant to whether the Attabotics system could operate with 50 robots 98% of the time in November 2021, when Attabotics contractually agreed its system would be fully operational. (Dkt. 11-3 at 5, 7).

Attabotics bears the burden of demonstrating that Dr. Du's testimony meets the *Daubert* standard and should be admitted. It has not met that burden[1] and Dr. Du should be precluded from offering at trial her conclusory and unsupported testimony, which lacks any methodology.

## ARGUMENT

### I.    Attabotics' generic statements about Dr. Du's "expertise" do not qualify her to offer opinions in this case.

Attabotics misses the mark when it relies on vague statements about Dr. Du's academic credentials, honorary associations, and unexplained robotics projects to argue that she is qualified to offer opinions in this case. (*See* Dkt. 123 at 3–5). The issue is not whether Dr. Du has credentials and experiences that might qualify her to testify in some hypothetical matter, but rather, whether she is qualified to offer opinions *in this matter*. *See Myers v. Ill. Centr. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) ("'The question we must ask is not whether an expert witness is qualified in

---

[1]    Attabotics does not even bother to defend Dr. Du's unsupported and unprincipled "handshake" opinion, which Bastian directly argued was inadmissible in its opening brief. (Dkt. 119 § B.iv., at 18).

2

general, but whether his qualifications provide a foundation for [him] to answer a specific question.'") (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)).

As the proponent of Dr. Du's testimony, Attabotics has the burden to demonstrate that Dr. Du is qualified to offer the particular opinions that she offers here. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). To do so, Attabotics must state with specificity why she is qualified to offer each of her opinions—Attabotics cannot rely on vague generalities only. *See Martins v. Sherwin-Williams Company*, 22-cv-3520 (BMC), 2023 WL 8788942, at *3 (E.D.N.Y. Dec. 19, 2023) ("expertise in the vague and broad category of 'pressure vessels'" was not sufficient to qualify a person to "opine on the design of spray-paint cans" where plaintiff failed to explain how "'pressure vessels'" were "analogous to spray-paint cans"); *Colby v. Newman*, 2:11-cv-07413-SVW (RZx), 2012 WL 12885118, at *1, *5 (C.D. Cal. Nov. 20, 2012) (excluding an expert because "vague assertions" concerning individual's expertise did not qualify individual "as an expert in forensic business accounting").

Yet Attabotics merely provides a laundry list of Dr. Du's supposed qualifications, without connecting those qualifications to this case. (*See* Dkt. 123 at 3–5). For example, Attabotics asserts Dr. Du is associated with two generic engineering groups, without explaining what those groups do or how those affiliations qualify her to opine on ASRS. (*See id.* at 4.) Likewise, Attabotics claims that Dr. Du is qualified to testify based on unspecified "mechatronics projects" that she worked on for third parties, without explaining her role or what those projects entailed. (*Id.*)

This vague, laundry list approach to establishing an expert's qualifications was rejected by the United States District Court for the Central District of California in *Colby v. Newman*, *supra.* In that case, the court excluded the testimony of a Certified Public Accountant ("CPA") attempting to opine on business accounting where his curriculum vitae contained only "vague assertions"

3

about his training and experience, including that he performed "a variety of assignments" as a forensic accountant, "has testified as an expert in family law and/or civil/commercial litigation matters," and "has been appointed as a forensic accounting and valuation expert pursuant to Evidence Code § 730 on several occasions." (*Id*. (internal citations omitted).)

In the court's view, the reference to a "variety of assignments" did not "inform the Court whether he performed each analysis once or a thousand times." *Colby*, 2012 WL 12885118, at *5. And upon closer examination, much of the CPA's litigation experience arose in the context of divorce proceedings, which was not the context for the dispute in *Colby*. *Id*. Further, the CPA's report and resume did not contain "any hard evidence" that he had expertise relevant to the matter at hand, such as experience in "vetting and allocating business expenses" and "comparing one business's financial information with those of similar situated business," among other things. *Id*. Because the expert lacked the proper qualifications to "render expert testimony in forensic business accounting," the court found "his opinion unreliable and therefore inadmissible." *Id*.

Like the party propounding the CPA's testimony in *Colby*, Attabotics offers a series of generalities about Dr. Du's work without providing information like what type of work Dr. Du performed for industry, the number of times she performed that work, how recently she performed such work, and how that work is analogous to the work done here. There is a conspicuous lack of "any hard evidence" that Dr. Du has the skills, training, or experience with ASRS to analyze it in the manner required here.

The reality is that Dr. Du has spent her entire career in academia, focusing on biomechatronics and bioresearch for the medical device and healthcare arena—none of which Attabotics demonstrates bears any relation to warehouse management systems and related technologies. Even Attabotics does not dispute that ASRS has not been Dr. Du's focus. (*See*

4

*generally* Dkt. 123). Accordingly, it is clear that Dr. Du lacks qualifications to opine about ASRS and related technologies here.

**II.    Dr. Du's investigation did not meet the standards expected of those in her field.**

Attabotics criticizes Bastian for supposed "hyperfocus on a portion of [Dr. Du's] investigation, rather than on her opinions" (Dkt. 123 at 7)—a position that fundamentally misunderstands the law on *Daubert* motions. The "focus" of a *Daubert* inquiry "*must be solely on principles and methodology, not on the conclusions they generate.*" *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S. Ct. 2786, 509 U.S. 579, 580 (1993) (emphasis added). Bastian's critique of Dr. Du's investigation is precisely that, and therefore, entirely appropriate.

Furthermore, it is not as if the issues with Dr. Du's methodology are limited to her investigation of the A360 site—*all* components of her so-called "analysis" are riddled with errors that undermine each of the opinions she offers. (*See* Dkt. 119 at 4, 11–18). As explained more fully in Bastian's opening brief, Dr. Du reached her conclusions in this case by: (1) visiting A360's facility in Olathe, Kansas, where she performed a basic visual inspection, but did not test any equipment, measure battery voltage, or ensure that the Nest was properly installed; (2) taking two tours of Attabotics' headquarters, where she spent about 20 minutes watching simulations and taking a few measurements, had a an hour-long conversation with an Attabotics' employee, and listened to a sales pitch from a member of Attabotics' sales team, but did nothing to vet what she had been told or to confirm that what she had seen and been told was true for the A360 site; and (3) doing a cursory review of source code and other documentation provided to her, including supposedly reading nearly 15,000 pages of source code that was, at best, only tested for less than a week before the ASRS was decommissioned. (*See id*.)

At every step of Dr. Du's supposed analysis, she did not apply the intellectual rigor expected of those in her field—essentially observing the technologies and listening to biased sales

pitches as any layperson could but applying the gloss of "expertise" to her conclusions. This plainly falls short of what *Daubert* requires. *See*, *e.g.*, *Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1109-10 (S.D. Ind. 2003) (holding that the methodology underlying an expert's opinion "[p]lainly did not display the same intellectual rigor as that of others in his field where it consisted of "a visual inspection of the junked car and some preliminary measurements of the driver's seat position" and consequently, sustaining the defendant's *Daubert* challenge).). And therefore, each of Dr. Du's ensuing opinions should be excluded.

Attabotics mounts no convincing defense of Dr. Du's conclusions. By Attabotics' own admission, all Dr. Du did when she visited A360 was take some "notes, photographs, measurements, and videos" and "climb[] to the top of the Nest to look at the entire structure." (Dkt. 123 at 7). In other words, Dr. Du took a tour and captured basic visual information about what she saw there, as any person with a notepad, ruler, and camera could do. Attabotics provides no explanation of how Dr. Du applied any "expertise" to this site visit, other than Dr. Du's *ipse dixit* that she analyzed robots at A360 "very carefully." (*See* Dkt. 123 at 7–8). This is ineffective. *See General Elec. Co. v. Joiner*, 118 S. Ct. 512, 522 U.S. 136, 146 (1997) (affirming exclusion of expert opinion that was connected to existing data only by the *ipse dixit* of the expert).

Attabotics does not seriously dispute most of the weaknesses that Bastian identified with Dr. Du's tours of Attabotics' headquarters either. (*Compare* Dkt. 119 at 12-13 *with* Dkt. 123 at 8–10). In response to Bastian's criticism that Dr. Du did not take any robots apart to examine their mechanics, Attabotics claims that Dr. Du looked at some schematics to "understand how the Ants' motors were assembled." (*See* Dkt. 123 at 9). But neither Dr. Du nor Attabotics explain how review of these schematics inform any of Dr. Du's opinions about the Attabotics System. (Dkt. 116-1 (not referencing any schematics in her opinions); Dkt. 123 at 9).

In response to the criticism that Dr. Du did not take common-sense steps to ensure that what she saw at Attabotics' headquarters was representative of what had been installed at A360, Attabotics points out that Dr. Du compared some (but not all) components of the two systems with pictures and limited measurements. (Dkt. 123 at 9). Again, Attabotics provides no explanation as to why these limited comparisons are adequate to ensure that Dr. Du's findings apply to the A360 site, and it is clear that they do not. By Dr. Du's own admission, key elements of the ASRS system installed at the A360 site were not present at Attabotics' headquarters. (*See, e.g.*, Dkt. 116-2 at 51:10–12 (testifying there was no pick station at the Attabotics' headquarters test site)). So, it is not credible that Dr. Du reached the conclusions that she did based on her two tours of Attabotics' headquarters, in combination with the A360 site visit and code review (discussed below). Not to mention that Dr. Du does not cite any of these comparisons in her report. (*See* Dkt. 116-1).

Finally, in response to the criticism that Dr. Du essentially relied on a sales pitch and brief conversations with unspecified Attabotics' employees, Attabotics adds the color that Dr. Du "spoke with multiple employees, including Attabotics' Founder and CEO, Scott Gravelle, Vice President of Business Development, Vice President of Product Delivery, and two more employees most familiar with the V4 Ant and Nest." (Dkt. 123 at 9). This unsworn and unsupported elaboration (after Dr. Du admitted she did not know who she spoke to) does little to bolster Attabotics' claim that Dr. Du performed a thorough review of the relevant technology, however. Attabotics provides no detail concerning what information those individuals conveyed; Dr. Du does not even cite these conversations in her report. (*See generally* Dkt. 119-1). And Dr. Du admitted during her deposition she did precisely nothing to confirm they have relevant expertise. (Du Dep. Tr. 48:9–50:20, Dkt. 116-2 at 26-28). Scott Gravelle himself admits he has no expertise:

> "I am the least qualified person on the planet to do my job."

(Dkt. 136-1 at 1). That Dr. Du credulously accepted the opinions of Mr. Gravelle—a "janitor, army medic, unemployed nurse and skateboarding manufacturing company owner" (*id.*)—certainly does not support admission of her testimony.

As Bastian explained in its opening brief, Dr. Du's approach is analogous to an approach that was rejected in *LG Electronics v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3613814, at *5, *8 (N.D. Ill. Sept. 3, 2010). (Dkt. 119 at 14–15). Attabotics attempts to distinguish this case by arguing that the expert in *LG Electronics* relied on lay, non-expert use of a dryer and review of two consumer publications, while Dr. Du applied ANSI/RIA standards and undertook "as extensive an analysis as could be performed under the[] circumstances." (Dkt. 123 at 10). However, as noted above and in Bastian's opening brief, Dr. Du's analysis was far from extensive. She could have, but failed to, take numerous basic steps to ensure that her analysis was reliable, and instead, chose to be little more than a "mouthpiece" for Attabotics.

As for the source that she used—ANSI/RIA R15.08—it is entirely irrelevant to this matter, as the source, itself, makes clear. ANSI/RIA R15.08 states that: "For the purposes of this document [the Standard] 'mobile] refers to *ground-based systems* that can navigate autonomously within their operating environment; airborne and waterborne systems, and *those mounted on rails*, are out of scope." (*See* RIA R15.08-1-2020, Sec. 1) (emphasis added). The Ant robots at issue in this case are not ground based—they operate within the Nest and workstations on vertical and horizontal rails. Accordingly, the ANSI/RIA standards Dr. Du cites are entirely irrelevant. Dr. Du's analysis here is not meaningfully distinguishable from the analysis that the court rejected in *LG Electronics*.

Attabotics would have this court believe that these criticisms go to the weight rather than admissibility or that somehow Dr. Du's analysis is greater than the sum of its parts. But this is simply untrue. Bastian's critiques go to the heart of the methodology (or more precisely, complete

8

lack of methodology) that Dr. Du used in this case and make clear that her analysis was fundamentally unsound. Because Dr. Du has completed failed to "employ the same intellectual rigor in [her proposed] testimony as would be employed by an expert in the relevant field," her testimony should be stricken. *See LG Electronics*, 2010 WL 3613814, at *1.

**III.    Dr. Du is not qualified to analyze code and did not use any discernible methodology to analyze the code she was provided, which was irrelevant anyway.**

Dr. Du's opinion related to the Nexus code should be excluded for at least four reasons. First, Attabotics does not identify any knowledge, skills, or experience that Dr. Du has with respect to software, much less software for an allegedly "state-of-the-art" ASRS. Second, Dr. Du applies no methodology to reach her opinion about the software. She simply asserts—after allegedly reading 15,000 pages of code in 63 hours, while writing her report—that she thought the code was "well thought out." Third, Dr. Du's analysis is simply not relevant to this litigation because she erroneously analyzed code that was used for *at most* five days before the final failing test in July 2022. Fourth, as discussed in Section V, *infra.*, Dr. Du's opinion is based on documents that Attabotics strategically decided not to produce until after the close of discovery and nearly seven weeks after Dr. Janét issued his own expert report on behalf of Bastian. Any of these deficiencies is independently enough to exclude Dr. Du's opinion on the code.

**A.    Attabotics does not point to any qualifications for Dr. Du to analyze the code.**

Nowhere in its 20-page brief does Attabotics identify any actual credentials that qualify Dr. Du to analyze Attabotics' software code. (*See generally* Dkt. 123). They do not point to any computer engineering or computer science courses that Dr. Du has taken or taught, any experience or training in coding, or any examples where Dr. Du has either written or analyzed code related to an ASRS project. Attabotics simply asks the Court to trust its word that she is well-qualified.

9

In its opening brief, Bastian explained that Dr. Du's erroneous assertion that the Attabotics' code was written in C is, itself, disqualifying. Even Dr. Du admits that she was wrong when she wrote in her report that the Nexus code was written in "c language." (*See* Dkt. 123 at 5). Attabotics attempts to minimize this glaring error by claiming that Dr. Du "could have been more precise in her statement." (*Id.*) But this understates the issue. C-Sharp cannot be read like C. The two languages are very different in terms of structure, syntax, performance, and memory management. (*See* Dkt. 119 at 9–10). If one treated C-Sharp like C, one would fundamentally misunderstand the code, in the same way that one reading German, applying the rules of English, would find the text to be unintelligible. (*See id.*). Attabotics resists this analogy but does not explain why it is wrong. (*See* Dkt. 123 at 5–6). Nor does it contest the basic proposition that anyone familiar with C-Sharp and C would never make such a basic mistake. (*cf.* Dkt. 123 § 1.B.).

Dr. Du corrected herself only after it became apparent through Dr. Janét's rebuttal report and her deposition and that she had made a fundamental error that no person with coding expertise would make. (Dkt. 128-1 at 42 (Dr. Janét pointing out the error in his June 19, 2024 rebuttal report); Du Dep. Tr. 132:7–24, Dkt. 116-2 at 90 (Dr. Du only admitting the code was not written in C after questioning); Dkt. 123-2 (Dr. Du quibbling on July 10, 2024 that the code was "written in c-based language")). At the time that Dr. Du drafted her report, she either (1) did not fully understand the difference between the two languages or (2) did not examine the source code closely. She needed Bastian's counsel and Bastian's expert to alert her to the issue. Because Dr. Du prepared her report before counsel and Dr. Janét alerted her, it reflects her fundamental misunderstanding of the code.

**B.**     **Dr. Du does not use *any* methodology to support her software opinion.**

Dr. Du was also wrong when she said that the Nexus code could not be tested. (Dkt. 119 at 11). It is well-known among those with coding expertise that there are ways to test code, as one

exemplar cited in Bastian's opening brief made clear. (*Id*.). Attabotics attempts to brush this criticism aside by arguing that Bastian cannot "rely on another apparently random website to maintain that Professor Du was required to perform its chosen test." (Dkt. 123 at 6). But Bastian is not criticizing Dr. Du for failing to perform a particular test but for failing to perform any test at all. (*See* Dkt. 119 at 11). Accordingly, Attabotics' citation to *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999), is inapposite. (*See* Dkt. 123 at 6). As Dr. Janét explains in his rebuttal report, Dr. Du identifies no methodology whatsoever, simply reciting banal platitudes such as the code was "long," "well-thought-out," and "looks good." (Dkt. 28-1 at 38–43).

The one testable proposition Dr. Du includes in this section of her report is that, "any experienced programmer always ensure to use *malloc()* or *calloc()* for every dynamic memory allocation," supposedly because this is necessary to "ensure[] that memory is freed." (Dkt. 116-1 at 17). But during her deposition Dr. Du had to admit that the Nexus code she supposedly reviewed does not actually contain any instances of these functions. (Du Dep. Tr. 169:4–8, Dkt. 136-2 at 6). As Dr. Janét explains in his rebuttal report, that is because these functions are used in C, not C-Sharp (highlighting the significant mistake Dr. Du made in her initial report), and in fact the code Dr. Du quotes is "intentionally leak[ing] threads" and "handles." (Dkt. 128-1 at 40–41). If Dr. Du's only testable proposition is applied, it shows that Attabotics' programmers are "not experienced."

## C.     Attabotics itself proves the code Dr. Du analyzed is irrelevant.

Attabotics agreed to provide a fully operational system—capable of 98% availability in all operating hours—no later than November 2021. (Dkt. 11-3 at 5, 7). Even if the Court credits Attabotics' interrogatory responses, the Nexus code in use at A360 in November 2021 was version 0.29.1. (Dkt. 123-3 at 13). It is not until (at the earliest) July 14, 2022—after failing multiple tests

and blowing past its contractual deadlines—that Attabotics allegedly[2] rolled out version 0.44.1, the version Dr. Du reviewed. (Dkt. 123 at 11–12). And in its haste to find something, *anything* to show this code was used at A360, Attabotics misses that a screenshot from just ten minutes later shows ███████████████████████████████████ on July 21, 2022:[3]



(*See also* Dkt. 94-6 at 1, 5 (admitting July 21, 2022 test failed and 9 ants were out of service)). Dr. Du's quick read of this failed version of code is simply irrelevant to the issues in this case.

**IV.     Attabotics does not defend Dr. Du's unsupported and unprincipled "handshake" opinion, thereby conceding Dr. Du should be barred from introducing that testimony.**

As Bastian argued in its opening brief (Dkt. 119 § B.iv., at 18), Dr. Du's conclusion that "Bastian's Exacta and A360's D365 software did not 'handshake' with Attabotics Nexus well," is based solely on Dr. Du's say-so and inadmissible. *See Constructor Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.*, 448 F. Supp. 3d 965, 971 ("[A]n expert cannot offer opinions based solely on his or her say-so …"). Dr. Du does not cite *any* documentary support for her opinion (Dkt. 116-1 at 14–15). And as Dr. Janét explained in his rebuttal report, Dr. Du provides neither a testable methodology, nor any evidence that a "handshake" protocol was not followed. (Dkt. 128-1, at 41–

---

[2]   Attabotics states in its interrogatory responses that "A360 and Bastian were both provided release notes as part of the Change Approval Board (CAB) process where Attabotics listed, in detail, every change and reason why it was performed." (Dkt. 123-3 at 12–13). But Attabotics does not provide CAB documents related to version 0.44.1 in opposition to this motion, and they do not appear to exist anywhere in any of the documents produced. So, what Attabotics describes as its best evidence seems to be completely lacking for this version of the Nexus code.

[3]   Dkt. 137-1 shows ████████████████████████████████████████████

46). Indeed, modern systems such as these rely on built-in internet protocols, not the outdated concept Dr. Du refers to as "hav[ing] the same speed to prevent data missing. [sic]" (Dkt. 116-1 at 18; *cf.* Dkt. 128-1, at 43). In any event, Dr. Du's "handshake" opinion is so obviously deficient that Attabotics' lawyers do not bother to defend it. (*See generally* Dkt. 123 (never referencing Dr. Du's "handshake" opinion)). Because Attabotics bears the burden to show *all* of Dr. Du's opinions meet the *Daubert* standard, her "handshake" opinion must be excluded. *See, e.g., Erickson v. Baxter Healthcare, Inc.*, 131 F. Supp. 2d 995, 999 (N.D. Ill. 2001) ("If an expert offers no support for an opinion ... the testimony is excludable.").

**V.    Dr. Du's opinions should be stricken to the extent they rely on access to sites, or source code, to which Dr. Janét was not given access.**

Attabotics does not dispute that exclusion is appropriate where a party manipulates the discovery process to either withhold, or provide untimely disclosure of, discovery to the other side. (*See generally* Dkt. 123 at 13–20). It simply disputes that the rules apply to it. Attabotics is wrong.

Bastian served several requests on Attabotics to inspect a site with an operational ASRS. (*See* Dkt. 116-6). In those requests, Bastian enumerated the two operational sites of which it was aware—the Gordon Food Service Calgary Distribution Center and the Marine Corps Logistics Command 5G Smart Warehouse Experiment—and included a broader request to inspect an "Attabotics' System installed in a location to be determined by Defendant Attabotics" to the extent one of the other sites was unsuitable. (*See id*.) Bastian told Attabotics it only wanted one inspection on multiple occasions: "[W]e are flexible as to location (we served inspection requests for multiple locations, but only want one inspection), scope, and timing." (Dkt. 116-7 at 2).

But rather than engage with Bastian in good faith, counsel for Attabotics brushed Bastian aside, going so far as saying the site visits would have *no probative value for the case whatsoever*:

> Attabotics' systems are bespoke and vary from customer to customer. Attabotics' systems also involve different technologies

> that were utilized for the A360 project. *The performance of Attabotics' components in other systems provides no probative value or admissible evidence for any issues in the ongoing litigation between Bastian and Attabotics.*
>
> As one may expect, then, the Attabotics components in the system installed at the Accelerate360 facility in Olathe, Kansas are *the only components that would provide probative value in this case.*

(*Id*. at 3) (internal citations omitted) (emphasis added). It beggars belief that after advising Bastian that "[t]he performance of Attabotics' components" in systems other than A360 "provides no probative value or admissible evidence for any issues in the ongoing litigation," Attabotics would then: (1) give its own expert access to an operational ASRS, other than at A360; and (2) move to exclude Dr. Janét for not conducting that examination. (*See* Dkt. 112 at 6) (criticizing Dr. Janét for "not observ[ing] an operational Attabotics system at a location other than A360").

The same is true of the code. (*See* Dkt. 119 at 18–23). Attabotics' own interrogatory responses disprove its contention that it only found out the code was relevant to its case after the close of fact discovery. Attabotics listed all of the alleged versions of the code in its interrogatory responses in October 2023. (Dkt. 123-3). Yet Attabotics withheld production until June 2024.

This is precisely the sort of gamesmanship that the Federal Rules are designed to avoid. *See Bankdirect Cap. Fin. LLC v. Cap. Premium Fin. Inc.*, No. 15 C 10340, 2018 WL 946396, at *3 (N.D. Ill. Feb. 20, 2018) ("Discovery is not a game of gotcha.") (internal quotation marks and citations omitted); *Duracell U.S. Operations, Inc. v. JRS Ventures, Inc.*, 17 C 3166, 2018 WL 704686, at *4 (N.D. Ill. Feb. 5, 2018) ("By requiring disclosure of relevant information and documents, the discovery provisions of the Federal Rules of Civil Procedure seek to avoid the surprise and secrecy that are antithetical to the informed determination of cases on their merits.").

Attabotics' gamesmanship does not end there. In the current briefing, Attabotics argues that any harm to Bastian is purely "fabricated," and Bastian cannot seek relief because it failed to move

14

to compel in response to Attabotics' April 15, 2024, letter. (*See* Dkt. 123 at 19–20). And even (falsely) asserts Bastian did not raise the issue with Attabotics prior to this briefing.[4]

Attabotics' representations change to fit the moment and are not internally consistent. The bottom line is that *either* (1) the ASRS in Attabotics' headquarters has probative value—contrary to Attabotics' earlier representations to Bastian—and Attabotics should have given Dr. Janét access to Attabotics' headquarters, *or* (2) the ASRS in Attabotics' headquarters has no probative value and Dr. Du's report is unreliable because it is based on her visit to Attabotics' headquarters.

Given Attabotics' representations in the April 15, 2024, letter, Bastian could hardly have been expected to move to compel Attabotics for a site visit. Attabotics told Bastian that the site visits would have "*no probative value or admissible evidence for any issues in the ongoing litigation between Bastian and Attabotics.*" (*See* Dkt. 116-6 at 3). Taking Attabotics at its word, as Bastian did then, the motion to compel would have been a waste of judicial and party resources. The basic Rule 37 sanction of exclusion is highly appropriate.

## CONCLUSION

The Court should grant Bastian's motion and exclude Dr. Du's testimony. She lacks the qualifications to support the opinions she offers, failed to use any repeatable or scientifically sound methodology, and Attabotics failed to produce documents, or allow inspections during discovery that are central to her (inadequate) investigation. *Daubert* requires Dr. Du's exclusion.

---

[4]    Bastian discussed the basis for exclusion with Attorneys Albaugh and Tanner during a teleconference on Friday, May 24. They disagreed, but no further conference was required.

Dated: August 9, 2024

Respectfully submitted,

**QUARLES & BRADY LLP**

*/s/ Joshua B. Fleming*
Joshua B. Fleming, #25954-29
Quarles & Brady LLP
135 N. Pennsylvania St., Suite 2400
Indianapolis, IN 46204
Josh.Fleming@quarles.com

Of Counsel
Raymond Jamieson
Patrick Proctor-Brown
Quarles & Brady LLP
411 East Wisconsin Ave., Suite 2400
Milwaukee, WI 53202-4428
Raymond.Jamieson@quarles.com
Patrick.Proctor-Brown@quarles.com

Jessica Heckinger Nowak
Quarles & Brady LLP
300 N. LaSalle Street, Suite 4000
Chicago, IL 60654
Jessica.nowak@quarles.com

*Attorneys for Plaintiff*
*Bastian Solutions, LLC*

16

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 9, 2024, I electronically filed the foregoing document with the Court using its electronic filing system, which electronically provided notice of such filing to the following:

Matthew Albaugh
Joseph Mitchell Tanner
Taft Stettinius & Hollister LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
317-713-3500
malbaugh@taftlaw.com
mtanner@taftlaw.com


*/s/ Joshua B. Fleming*


Joshua B. Fleming
Quarles & Brady LLP
135 N. Pennsylvania St., Suite 2400
Indianapolis, IN 46204
Josh.fleming@quarles.com

Of Counsel
Raymond Jamieson
Patrick Proctor-Brown
Quarles & Brady LLP
411 East Wisconsin Ave., Suite 2400
Milwaukee, WI 53202-4428
Raymond.Jamieson@quarles.com
Patrick.Proctor-Brown@quarles.com

Jessica Heckinger Nowak
Quarles & Brady LLP
300 N. LaSalle Street, Suite 4000
Chicago, IL 60654
Jessica.nowak@quarles.com