June 19, 2024

Raymond Jamieson

Quarles & Brady

Re: Bastian Solutions, LLC v. Attabotics, Inc. [No. 1:23-cv-00198-JRS-TAB, Southern District of Indiana]

Dear Mr. Jamieson:

The following constitutes my rebuttal report in the above-captioned matter, in response to Dr. Winncy Du's report.

All opinions and conclusions stated in this report are based on my work to date on this matter, as well as my background, education, training and experience, and are stated to a reasonable degree of engineering certainty. I reserve the right to supplement my report and testimony in light of new discoveries, including aspects of the produced and pending records and/or other evidence. At any deposition, trial or hearing at which I may testify in this matter, I may provide demonstrative aids, such as computer animations, excerpts, and figures from relevant references, and physical examples to assist in explaining the subject matter in my report.

I reserve the right to use demonstratives or other exhibits at trial to support my opinions in any of my expert reports and/or supplements thereto. I charge a rate of $700/hour for all work I perform in this matter. My compensation is not contingent upon my opinion.

I include by reference in its entirety my original report from April 22, 2024.

Jason A. Janét, PhD



# Contents

1    INTRODUCTION.................................................................................6

2    DOCUMENT SCOPE & ORGANIZATION.................................................6

    2.1    QUALIFICATIONS............................................................................6

    2.2    RIGHT TO SUPPLEMENT...................................................................7

3    ATTABOTICS DOES NOT DISPUTE THE FOLLOWING PREVIOUS OPINIONS.......................................................................................7

    3.1    BASTIAN GENERALLY FULFILLED CONTRACTUAL OBLIGATIONS ............7

    3.2    ATTABOTICS GENERALLY DID NOT FULFILL CONTRACTUAL OBLIGATIONS ............7

    3.3    ATTABOTICS DID NOT DELIVER V5 ANTS..........................................8

    3.4    ATTABOTICS' NEXUS SOFTWARE WAS EXTREMELY DEFICIENT...............8

    3.5    ATTABOTICS' ASRS EXPERIENCED DAILY AND PROBLEMATIC REBOOTS, CRASHES AND FAILURES ................................................................8

    3.6    ATTABOTICS' ASRS HAD SEVERE SCALABILITY ISSUES.......................8

    3.7    ATTABOTICS' ASRS FAILED TO MEET PERFORMANCE METRICS ............8

    3.8    ATTABOTICS' ANTS EXPERIENCED MANY FIRMWARE ISSUES ...............9

    3.9    ATTABOTICS DID NOT DISCLOSE DATA FROM INCIDENT LOGGING RESOURCES ......9

    3.10    ATTABOTICS SYSTEM DID NOT DISCLOSE POTENTIAL CAPACITOR BANK ISSUES ..10

    3.11    ATTABOTICS LACKED TRANSPARENT COMMUNICATIONS REGARDING GEARBOX ISSUES.....................................................................10

    3.12    THE ATTABOTICS ASRS SHOULD FULFILL BASIC AND PRAGMATIC FUNCTIONAL REQUIREMENTS.....................................................10

    3.13    THE ATTABOTICS ASRS IS COMPRISED OF CERTAIN ELEMENTS ............14

    3.14    THE ATTABOTICS ASRS EXHIBITS NUMEROUS DEFICIENCIES ...............15

    3.15    DEFICIENCIES OF THE ATTABOTICS ASRS INHIBIT THE SYSTEM FROM FULFILLING BASIC AND PRAGMATIC FUNCTIONAL REQUIREMENTS.....................17

    3.16    THE ATTABOTICS ASRS EXHIBITED IMPAIRED BEHAVIOR...................17

4    RESPONSE TO DR. DU'S GENERAL COMMENTS.............................................20

    4.1    ATTABOTICS CUBE STORAGE MATRIX APPROACH IS NOT ADVANTAGEOUS .........21

        4.1.1    Attabotics Bins Are Not "stacked…like building blocks" ...................21

*4.1.2    Attabotics Does Not Have a Higher Storage Capacity than AutoStore*................21

*4.1.3    Attabotics is Not the New Industry Standard in Today's High-Tech Warehouse*..24

**5    RESPONSE TO DR. DU'S OPINION 1: THE ATTABOTICS ASRS V4 WAS NOT A PROTOTYPE BUT A MATURED AND INDUSTRIAL-GRADE SYSTEM. BOTH ITS HARDWARE AND SOFTWARE UTILIZED STATE-OF-THE-ART TECHNOLOGIES**..................................................................................**25**

5.1    DR. DU LACKS RELEVANT INDUSTRY EXPERIENCE ................................25

5.2    DR. DU SEEMS TO NOT UNDERSTAND THE TERM "PROTOTYPE" AS USED IN INDUSTRY ...................................................................................25

5.3    THE ATTABOTICS ASRS IS NOT A MATURED AND INDUSTRIAL-GRADE SYSTEM ...28

**6    RESPONSE TO DR. DU'S OPINION 2: ATTABOTICS' ASRS V4 MET THE A360 REQUIREMENTS AND THE INDUSTRY STANDARDS** ..............................**30**

6.1    THE ATTABOTICS ASRS DID NOT MEET THE THROUGHPUT REQUIREMENTS ........30

6.2    THE ATTABOTICS ASRS DID NOT MEET THE AVAILABILITY REQUIREMENTS .......30

6.3    DR. DU'S OPINION ABOUT INDUSTRY STANDARD ANSI/RIA R15.08 IS IRRELEVANT ...................................................................................31

6.4    ATTABOTICS' V4 ANT WHEELS CAN TOUCH AND INTERFERE WITH EACH OTHER..32

6.5    DR. DU'S OPINIONS ABOUT THE ANT GEARBOXES ARE IRRELEVANT AND UNFOUNDED ...................................................................................33

6.6    DR. DU'S OPINIONS ABOUT THE ANT DRIVE LIFT MECHANISM ARE IRRELEVANT AND UNFOUNDED...................................................................................34

6.7    DR. DU'S OPINIONS ABOUT THE ANT WHEEL SYNCHRONIZATION ARE IRRELEVANT AND UNFOUNDED...................................................................................35

6.8    DR. DU'S OPINIONS ABOUT THE CAPACITOR BANK ARE IRRELEVANT AND UNSUPPORTED ...................................................................................35

6.9    DR. DU'S OPINIONS ABOUT THE NEST STRUCTURAL DEFECTS DO NOT DISPUTE MY OWN ...................................................................................36

**7    RESPONSE TO OPINION 3: ATTABOTICS' NEXUS SOFTWARE SUPPORTS THE ASRS WITH THE REQUIRED FUNCTIONS**.................................................**36**

7.1    DR. DU DOES NOT ADDRESS MY ANALYSIS OF SOFTWARE DEFECTS ...................36

7.2    DR. DU USES INVALID METHODOLOGY IN EXAMINING THE NEXUS CODE .............38

    7.2.1    *Dr. Du Fails to Define the Problem*..........................................................38

    7.2.2    *Dr. Du Provides Incorrect Types of Evidence* .........................................39

    7.2.3    *Dr. Du's Static Code Analysis is Invalid and Incomplete* .....................39

7.3    DR. DU'S EVIDENCE AND ANALYSIS ARE MINIMAL....................................39

7.4    DR. DU GETS BASIC FACTS ABOUT MEMORY MANAGEMENT IN THE ATTABOTICS CODE WRONG ......................................................................................40

**8    RESPONSE TO OPINION 4: BASTIAN'S EXACTA AND A360'S D365 SOFTWARE DID NOT APPEAR TO "HANDSHAKE" WITH ATTABOTICS NEXUS WELL, WHICH COULD CAUSE COMMUNICATION OR MISSING (ORDER) DATA PROBLEMS..................................................................41**

8.1    DR. DU'S "HANDSHAKE" CLAIM LACKS RELEVANCY ............................41

8.2    DR, DU'S METHODOLOGY IN EXAMINING THE "HANDSHAKING" BETWEEN ATTABOTICS AND BASTIAN IS INVALID..................................................42

8.3    DR. DU PROVIDES NO EVIDENCE OF BASTIAN OR A360 NOT FOLLOWING A HANDSHAKE PROTOCOL ....................................................................43

**9    SUMMARY OF OPINIONS........................................................................44**

**10    APPENDIX A–FILES REVIEWED .........................................................45**

10.1    GENERAL PLEADINGS (DELAWARE MATTER)........................................45

10.2    GENERAL PLEADINGS (INDIANA CASE)..................................................45

10.3    DEPOSITION AND DEPOSITION EXHIBITS................................................45

10.4    BATES REFERENCED IN BASTIAN RESPONSE TO ATTABOTICS 04/15/24 #7 INTERROGATORY: ..................................................................................47

10.5    NICOLE SCHIMPF INSPECTION 04/04/23 ................................................48

10.6    ATTABOTICS VIDEOS FROM ATTABOTICS WEBSITE: ............................48

10.7    ATTABOTICS DISCOVERY RESPONSES:....................................................48

10.8    ATTABOTICS DOCUMENTS PRODUCED: ..................................................48

10.9    A360 DOCUMENTS PRODUCED TO ATTABOTICS SUBPOENA: ................48

10.10    BASTIAN DOCUMENTS PRODUCED:........................................................48

10.11    BASTIAN DISCOVERY RESPONSES: ........................................................48

10.12    PHOTOS .................................................................................................49

10.13    JANET, JASON-03-06-24 TO 03-08-24 ANTS INSPECTION DOCUMENTS–

PHOTOS, VIDEOS ...............................................................................49

10.14    WORK PRODUCT ..................................................................................49

10.15    SENT ON 04/21/24: ..............................................................................49

10.16    STANDARDS AND OTHER REFERENCES ...................................................50

## 1    Introduction

My name is Jason Janét. I have been retained by the Law Offices of Quarles & Brady LLP on behalf of Plaintiff, Bastian Solutions, LLC (Bastian). I submitted a report on April 22, 2024 (my April Report), which I include herein in its entirety by reference, from my investigation of certain issues related to an automatic storage and retrieval system (ASRS) manufactured by Defendant, Attabotics Inc. (Attabotics) that was installed at the facilities of Accelerate 360, LLC (A360).

In my April Report I opined that, while Bastian and A360 followed through on their respective obligations and, while both provided every opportunity for Attabotics to deliver and succeed at the agreed-upon deliverables, Attabotics under-delivered, was deceptive and derelict in its execution, and provided a pre-production system exhibiting "negative reliability". [Roark Dep. Tr. 101:14-15]

In response, Attabotics' expert witness, San Jose State University Professor Winncy Du, PhD, submitted a report. In her report, Dr. Du contested a select subset of opinions from my April Report. However, the vast majority of my opinions and observations remained undisputed.

In addition to materials cited herein and in my April Report, Appendix A contains a list of additional materials I have considered in connection with forming the opinions I provide in this rebuttal report.

## 2    Document Scope & Organization

This document provides an examination of Dr. Winncy Du's rebuttal report. Dr. Du was silent on the majority of the opinions I laid forth in my initial examination. Along with this, she made several general, conclusory statements, without foundation or explanation.

### 2.1    Qualifications

My qualifications in robotics, automation, automated storage and retrieval systems (ASRS) and industrial control systems are set forth in my resume, which was provided in Appendix C of my April Report, along with summaries of my academic, education, industry experience, and expert witness consulting. A list of prior expert witness matters were shown in Appendix D of my April Report, showing that I have testified as an expert witness in approximately 80 litigation matters regarding intellectual property and contract disputes in venues that include, but are not limited to, the International Trade Commission, US Federal/District Court, the USPTO PTAB, and international Court systems.

## 2.2  Right to Supplement

7.  In the event additional information comes to light that is relevant to my opinions, or further issues arise that concern the subject matter in this report, I expressly reserve the right to supplement, modify, or amend my opinions as well as the bases supporting my opinions. I also reserve the right to consider and comment on additional evidence that may be presented by opposing experts or parties.

8.  I further reserve the right to supplement and/or amend this report to submit a reply declaration based on any information or contentions expressed by opposing parties or experts attempting to rebut my opinions in this report.

9.  At any trial or hearing at which I may testify in this matter, I may provide demonstrative aids, such as computer animations, excerpts, and figures from relevant references, and physical examples to assist in explaining the subject matter in my report. I reserve the right to use demonstratives or other exhibits at trial to support my opinions in any of my expert reports and/or supplements thereto.

## 3  Attabotics Does not Dispute the Following Previous Opinions

### 3.1  Bastian Generally Fulfilled Contractual Obligations

10.  Dr. Du did not dispute, as a general matter, that Bastian fulfilled the obligations set forth and tabularized in Section 1.1.1. Among these, Dr. Du does not dispute that Bastian served as the integrator and interface with A360, and fully supported Attabotics throughout the project.

### 3.2  Attabotics Generally Did Not Fulfill Contractual Obligations

11.  Dr. Du also did not dispute, as a general matter, that Attabotics failed to supply Bastian with a fully functioning Attabotics Robotic Warehousing and Fulfillment System (the "System"), complete with v5 robots, technical documentation, product specifications, service or maintenance information, and other information responsive to A360's requirements or requests [April Report, ¶¶ 7, 9, 44, 47, 54]. Additionally, Dr. Du did not dispute that Attabotics failed to take measures necessary, including the use of overtime or express freight, to meet the scheduled delivery dates, without additional cost to Bastian, in the event that Attabotics will be unable to meet the agreed-upon delivery schedules [April Report, ¶¶ 7, 18]. Most importantly, Dr. Du did not dispute that Attabotics failed to provide prior to Go-Live (Aug 27, 2021) an operational system comprising 50 v5 robots ("Ants"), that operated at a verifiable throughput average of 116 bin presentations/workstation, and a verifiable availability of 98% of all required components during operational hours at 9 hours/day, 5 days/week [April Report, ¶¶ 7, 43].

### 3.3    Attabotics Did Not Deliver v5 Ants

12. Central to the A360 project, and as a specific matter, Dr. Du did not dispute that Attabotics never provided the v5 Ants to Bastian for the A360 project that it had contractually agreed to deliver. Rather, the provided robots were used v4 robots upgraded from v3 robots used in the unsuccessful Nordstrom project [April Report, ¶¶ 7, 9-10, 44, 47, 54].

### 3.4    Attabotics' Nexus Software was Extremely Deficient

13. Dr. Du did not dispute that Attabotics' Nexus software was extremely deficient. She does not dispute that it was not able to operate in an independent fashion, being initially incapable of tracking order status, and that this deficiency prompted Bastian to make changes to the FSDs that defined the interface between the Attabotics software and the Bastian software [April Report, ¶¶ 16-18].

### 3.5    Attabotics' ASRS Experienced Daily and Problematic Reboots, Crashes and Failures

14. Dr. Du did not dispute that the Attabotics ASRS experienced a problematic reboot, workstation crash, or Ant failure almost every day of operation from December 13, 2021 through February 15, 2022 [April Report, ¶ 18].

### 3.6    Attabotics' ASRS had Severe Scalability Issues

15. Dr. Du did not dispute that the Attabotics system had severe scalability issues. She does not dispute that, although designed to utilize 50 Ants, Attabotics' Nest System could not scale above about 30 Ants without significant problems. [April Report, ¶¶ 21-23, 30].

16. Dr. Du did not dispute that the Attabotics' ASRS had severe scalability issues. Although Attabotics sold the System as designed to use 50 Ants, the System could not scale above approximately 30 Ants without significant operational problems. Based on my review of documentation and testimony produced in discovery, Attabotics' inability to scale its system is related to software issues reflected–at least in part–in the observed bugs related to memory management, communications, and routing [April Report, ¶¶ 21–23, 30]. Although I understand Dr. Du argues that Attabotics' software "contains leak management and handling" [Du Report at 14], as I explain further below, her analysis is not based on a sound methodology or available data, and does not undermine my conclusion that memory management played a role in the scalability issues describes by Attabotics' employees.

### 3.7    Attabotics' ASRS Failed to Meet Performance Metrics

17. Attabotics' ASRS failed to pass acceptance tests sanctioned by A360 [April Report, ¶ 40]. The System did not meet the test targets for the performance metrics associated with throughput and

availability. Dr, Du does not dispute that the System was not able to pass throughput testing prior to March 3, 2022. Nor does she dispute that Attabotics' Nest System failed its first availability testing on February 23, 2022, followed by a second failure on July 19, 2022, a third failure on July 20, 2022, and a fourth failure on July 21, 2022, in which the Attabotics Nest was only operational for 1.5 to 2 hours, and 9 ants had emergency stops [April Report, ¶ 43]. The contractually obligated date before which the Attabotics ASRS was required to pass availability testing was August 27, 2021.

18. Dr. Du does not dispute that the Attabotics ASRS failed to meet the March 15, 2022 deadline for the A360 Project to achieve System Acceptance under Article 9.3 of the System Agreement and the March 24, 2022 deadline to cure the failed acceptance test under Article 5 of the System Agreement [April Report, ¶ 43].

### 3.8    Attabotics' Ants Experienced Many Firmware Issues

19. Dr. Du does not dispute that the Ants themselves experienced numerous firmware issues that hindered the overall ability of the system to automate order fulfillment. [April Report, ¶ 18].

20. Firmware bugs include non-synchronized wheel motors at certain operating voltages. Additionally, Dr. Du does not dispute that the Ants repeatedly failed to queue at the workstation lanes, causing those behind to become stuck at the Pick station. These Ants could not be rerouted without manual intervention. Further, Dr. Du does not dispute that some versions of the Ant-equipped camera firmware would exhibit anomalous behavior as a result of reading/misreading some codes, potentially causing crashes [April Report, ¶ 30]. Dr. Du does not dispute that the Attabotics' Ants experienced firmware issues, or that those firmware issues degraded the availability of the Attabotics System.

### 3.9    Attabotics Did Not Disclose Data from Incident Logging Resources

21. Dr. Du did not dispute that a potential lack of transparency existed being that data from incident logging resources were not conveyed. *Smartsheet* and *Hivemind* appear to be two of these error-logging databases. Dr. Du does not dispute that no records from either of these two databases were provided to Bastian or A360. Dr. Du did not dispute my opinion that, if these records were not furnished, it suggests a lack of transparency, which is bound to delay issue resolution and strain a working relationship [April Report, ¶¶ 45-46]. Dr. Du does not dispute my conclusion that Attabotics' failure to disclose data from incident logs suggest a lack of transparency. Regardless, I reserve the right to supplement my testimony based on additional disclosures such as the Attabotics *Smartsheet* and *Hivemind*.

### 3.10    Attabotics System Did Not Disclose Potential Capacitor Bank Issues

22. Dr. Du did not dispute that an additional potential lack of transparency existed, being that Attabotics did not initially disclose their suspicion that its capacitor banks were likely what caused the fire at the Nordstrom facility. Rather, Attabotics waited 5 months to take corrective actions, debating as to how to communicate the issue, and ultimately deciding to re-cast their corrective actions regarding the "thermal event" prone capacitor bank as an "upgrade" [April Report, ¶¶ 10, 29, 44, 46-47].

23. Dr. Du does not dispute that the v4 version of the Ants that experienced thermal events and other issues at Nordstrom were repurposed by Attabotics and supplied by Attabotics on the A360 project, without disclosure to either A360 or Bastian, and notwithstanding that all of the Ants that were to be supplied by Attabotics were required to be v5 Ants [April Report, ¶¶ 10, 29, 44, 46–47]. Dr. Du does not dispute this conclusion from my April Report.

### 3.11    Attabotics Lacked Transparent Communications Regarding Gearbox Issues

24. Dr. Du did not dispute that Attabotics was not transparent in its communications regarding issues with Ant drive motors and/or gearboxes. Mr. Roark explains that "the gearboxes were getting misaligned", causing 48 "derailment" and "crashes". [Roark Dep, Tr. 176:15–177:18]. Dr. Du does not dispute that further issues such as "derailments" were also attributed to the gearboxes, although conflicting emails were sent in which Mr. Hickman states the problem of derailment is "really not the gearbox" [ATTA_0143321]. Dr. Du does not dispute that, similar to how the company handled the capacitor bank issues, Attabotics described their efforts to address the gearbox issues as an "upgrade", which is not accurate [April Report, ¶¶ 47-48].

25. Although Dr. Du states, in a conclusory fashion, that the Attabotics Ants met industry standards, she does not address the significant gearbox issues testified to by Attabotics employees and reflected in documents produced by Attabotics. As such, it remains my opinion that Attabotics provided non-conforming and defective goods and services, and that what was provided did not satisfy the agreed-upon requirements.

26. In contrast, Dr. Du does not dispute that Bastian provided all deliverables and services, and fulfilled its part of the agreed-upon requirements.

### 3.12    The Attabotics ASRS Should Fulfill Basic and Pragmatic Functional Requirements

27. Dr. Du does not dispute my opinion that the Attabotics ASRS should be able to fulfill the functional requirements that I listed in my April Report in Table 1. There, I described the listed functional requirements as necessary for the "basic and pragmatic operation of the Attabotics ASRS." Dr. Du's rebuttal report does not dispute any of the functions identified in the list. For convenience, this list of functional requirements is reproduced here as Table 1.

**Table 1: Select Attabotics ASRS Functional Requirements.**

| ID | Function | Additional Comments |
|---|---|---|
| F01 | Automate Order Fulfillment | Highest Level (i.e. root) Functional Requirement. Automate product storage & retrieval while meeting target throughput and availability. |
| F10 | Induct / Replenish Nest Inventory | As orders are fulfilled, system must accommodate new product inducted into the Nest to replenish stock. |
| F11 | Identify Induction Product | Product identification is necessary so that a given product can be associated with a specific tote for later retrieval. |
| F12 | Designate Tote for Product Storage | A uniquely identifiable tote is designated to store a given product. |
| F13 | Present Tote for Induction | Designated tote is presented to an operator at an induction workstation. |
| F14 | Dispatch Ant for Retrieval | Ant residing in the Nest is dispatched to retrieve designated tote. Ant must traverse 3D path synthesized by system to arrive at desired tote. |
| F15 | Retrieve Tote | Ant retrieves tote from Nest shelf. |
| F16 | Transport Tote to Induction Workstation | |
| F17 | Store Tote in Nest | |
| F18 | Designate Storage Location | |
| F19 | Transport Tote to Storage | |
| F20 | Dispense Tote | |
| F30 | Fulfill Orders | |
| F31 | Present Product for Order Fulfillment | |
| F32 | Review Order Data | |
| F33 | Identify Tote for Order Fulfillment | |
| F34 | Dispatch Ant for Retrieval | |
| F35 | Retrieve Tote | |

11



| | | |
|---|---|---|
| **F36** | Transport Tote to Outbound Workstation | |
| **F37** | Direct Picking Task | |
| **F40** | Achieve Throughput & Availability Targets | |
| **F41** | Optimize Nest Logistics to Exhibit Target Inbound & Outbound Rates | |
| **F42** | Maintain Target Availability | |
| **F50** | Robust Exception Handling | |

28. In addition to the preceding, Dr. Du does not dispute my presentation of functional requirement relationships shown in Figure 9 of my April Report. This function tree diagram displayed the dependencies of various functional requirements. For convenience, it is reproduced here as Figure 1. These relationships are important because they provide insight into how the failure to perform one function impacts the fulfillment of dependent functions.



**Figure 1: Function Tree for Select Attabotics ASRS Functions.**

### 3.13    The Attabotics ASRS is Comprised of Certain Elements

29. Dr. Du does not dispute my opinion that the Attabotics ASRS is comprised, in part, of the elements that I listed in Section 3.2 of my April Report. As described, each element substantively contributes to fulfilling one or more functional requirements. For convenience, this table is reproduced here as Table 2.

**Table 2: Select Attabotics ASRS System Elements.**

| ID | Element | Additional Comments |
|---|---|---|
| E1 | Nest | Cube-storage structure facilitating tote storage within a 3D matrix. Pathways within the matrix are provided so that Ant robots can access tote storage, Induction Workstations, and Pick Workstations. |
| E2 | Induction Station | An induction workstation enables operators to induct / replenish inventory stored within the Nest. Totes for inducting product are presented to the operator at the induction workstation. Touchscreen computers at the induction workstation are used to direct and confirm induction tasks. |
| E3 | Pick Station | An outbound workstation enables operators to fulfill orders with products stored within the Nest. Product-storing totes are presented to the operator at the outbound workstation, from which operators "pick" products. Touchscreen computers at the outbound workstation are used to direct and confirm order-fulfillment tasks. |
| E4 | Ant | An Attabotics Ant is an electro-mechanical Tote transport vehicle that operates within the Nest. It is capable of traversing along horizontal and vertical pathways embedded throughout the Nest, retrieving and dispensing Totes from and to Nest storage shelves, and executing dispatch/transport directives from the Nexus Nest management software. |
| E5 | Tote | A Tote is a uniquely identifiable storage unit (i.e. crate) that provides a volume within which items are stored. Its volume can be subdivided individual compartments. |
| E6 | Nexus Software | Software that provides the overall control, management, logistics, and exception handling for the Nest and associated Ants. |
| E7 | Integrator Software | Interface-specific middleware provides a messaging layer between Nexus and interfacing protocols. |
| E8 | Workstation Software | End-user facing software deployed at induction and pick workstations. |
| E9 | Ant Firmware | Software internal to each Ant for processing onboard sensor data, actuating motors and other actuators, and communicating with Nexus. |
| E10 | Communication Systems | Communication infrastructure (networking equipment and software) used to facilitate Nexus/Ant network communication. |

### 3.14  The Attabotics ASRS Exhibits Numerous Deficiencies

30. In my April Report I opined that the Attabotics ASRS exhibited numerous deficiencies. A non-comprehensive list of these deficiencies was included in Table 3 of my April Report. Many of these deficiencies were not disputed by Dr. Du. For convenience, I have reproduced the list of deficiencies from my April Report below in Table 3. For each item, I have indicated whether Dr. Du disputes the deficiency in her rebuttal report. I address disputed items in subsequent sections of this report.

Table 3: Select Attabotics ASRS Defects & Deficiencies.

| ID | Deficiency | Additional Comments | Example Source(s) | Disputed |
|---|---|---|---|---|
| D1 | Second-Hand Ants Used with System | | Roark Dep. Rough, p82:1-2; Bastian Dep. Ex. 45, 83, 118, 133; | No |
| D2 | Ant Bolts Prone to Loosening | | Bastian Dep. Ex. 45, 83, 118, 133; | No |
| D3 | Ant Connectors Prone to Loosening | | Appendix B, 10.8; Bastian Dep. Ex. 84; | No |
| D4 | Ant PCB Prone to Fouling and/or Short-Circuiting | | Appendix B, 10.9 | No |
| D5 | Gearbox Deficiencies | | Roark Dep. Rough, p173:5-17; Bastian Dep. Ex. 83, 84; ACCBAS00030980; Appendix B, 10.4 | Partially |
| D6 | Drive Lift Mechanism Prone to Mobility Failure | | Appendix B, 10.11 & 10.6 | Partially |
| D7 | Drive Wheels Prone to Interference and Mobility Failure | | Appendix B, 10.11 | Partially |
| D8 | 3D-Printed Capacitor Charger Components not Production Grade | | Appendix B, 10.2 | Partially |
| D9 | 3D-Printed Wheel Drive Motor Assembly Components not Production Grade | | Appendix B, 10.1 | Partially |
| D10 | Reliance on 8-Axis Motor Synchronization for Ant Vertical Travel | | Roark Dep. Rough, p102:22-24; | Partially |

15

| | | | | |
|---|---|---|---|---|
| D11 | Rapid Wear of Critical Ant Components | | Roark Dep. Rough, p100:8-12; Bastian Dep. Ex. 62, 84, 117; | No |
| D12 | Drive Cables Prone to Shorting | | Roark Dep. Rough, p97:23-p98:1; | No |
| D13 | Defective Camera Firmware | | Roark Dep. Rough, p93:21–p94:2; Roark Dep. Rough, p94:12-13; | No |
| D14 | Inherent Limitations of Capacitor-Power Bank | | Roark Dep. Rough, p134:4-6; | Partially |
| D15 | Nest Structural Defects | | Roark Dep. Rough, p113:15-20; Bastian Dep. Ex. 79, 80, 135, 136; ACCBAS00030980; | Partially |
| D16 | Defective Ant Firmware | | Roark Dep. Rough, p126:25–p127:7; Bastian Dep. Ex. 83, 86, 88, 122; | Partially |
| D17 | Deficient Pick Station Ant mobility | | Roark Dep. Rough, p142:16-p143:12; | No |
| D18 | Deficient Pick Station Memory Management | | Roark Dep. Rough, p148:3-13; Bastian Dep. Ex. 139; ACCBAS00030980; | No |
| D19 | Deficient HMI Credential Management | | Bastian Dep. Ex. 139; | No |
| D20 | Deficient Scaling Capability | | Roark Dep. Rough, p151:8-13; Bastian Dep. Ex. 89; | No |
| D21 | Light Curtain Prone to False Positive | | Bastian Dep. Ex. 31, 59, 68; ACCBAS00030980; ACCBAS00040706; Roark Dep. Rough p144:15-194:9 | No |
| D22 | Deficient Exception Handling | | Roark Dep. Rough, p222:20–p224:17; Bastian Dep. Ex. 72, 82, 83; ACCBAS00030890; | Partially |
| D23 | Deficient Routing | | Bastian Dep. Ex. 125. ACCBAS00030980; ACCBAS00030890; ACCBAS00040706;; | Partially |
| D24 | Deficient Ant Communication Network | | Bastian Dep. Ex. 18, 83; ACCBAS00030980; | Partially |

16

**3.15  Deficiencies of the Attabotics ASRS Inhibit the System from Fulfilling Basic and Pragmatic Functional Requirements**

In Section 4.1 of my April Report, I described how the deficiencies of the Attabotics ASRS impair functionality. I specifically related the deficiencies of Table 3 to specific ASRS elements, and then opined about which functional requirements are impacted as a result. Although Dr. Du does dispute, to some extent, a few of the deficiencies that I identified in Table 3, her report does not appear to dispute any of the relationships that I established in Section 4.1 of my April Report.

For example, Dr. Du does dispute my contention that the Nest exhibited structural defects (D15). She states that "laser alignment and adjustable feet were used to check straightness and squareness" [Du Report, at 12].[1] However, she does not appear to dispute the relationships illustrated in Section 4.1.1 of my April Report that structural defects in the Nest would inhibit the ASRS from fulfilling the functions of Transporting Totes to Outbound Workstations (F36), Retrieving Totes (F35), Transporting Totes to Storage (F19), Transporting Totes to Induction Workstations (F16), Retrieving Totes (F15), and all dependent functions (F31, F30, F17, F13, F10, and F1). Similarly, Dr. Du does not dispute the deficiency, element, function relationships that I illustrated in Sections, 4.1.2–4.1.7 of my April Report.

**3.16  The Attabotics ASRS Exhibited Impaired Behavior**

In Section 4.2 of my April Report, I opined that the extent to which deficiencies impair the functionality of the Attabotics ASRS can be appreciated by considering documented examples of impaired behavior. For convenience, the list of impaired behavior examples itemized in my April Report is reproduced here as Table 4. For each item in Table 4, I have indicated whether or not Dr. Du disputes the deficient behavior in her rebuttal report. I address disputed items in subsequent sections of this report.

Although Dr. Du asserts, generally, that the Attabotics ASRS "was a reliable and functional system" [Du Report, at 5; see also *id* at 10], and that the system "met A360' needs" [*id* at 8], Dr. Du failed to address or otherwise dispute many of the specific examples of inhibited functionality identified in my April Report.

For example, Dr. Du does not contest any of the instances where the Attabotics ASRS failed to pass availability tests sanctioned by A360 (S1), failed to operate with 50 ants (S2), prevented access to product in the nest (S5), exhibited disruptive behavior at workstations (S6), required system restart/reboot (S7), was wholly inoperative (S8), missed picks (S9), failed to queue ants at workstations (S10), rendered Ants unusable at a rate exceeding the repair rate (S11), exhibited trapped ants (S12), immobilized ants (S13), caused ants to become stuck within the nest due to

---

[1] Dr. Du does not list any evidentiary support for her conclusion that "Attabotics [] ensured accuracy and consistency," and I am not directly aware of any support for this conclusion in the documents listed in Dr. Du's report.

mechanical interference (S14), exhibited frequent "Rogue" Ants (S15), caused ants to fall (S16), caused ants to derail (S17), caused ants to collide (S18), and exhibited communication failures between Nexus and ants (S19).

**Table 4: Inhibited Functionality Examples of the Attabotics ASRS.**

| ID | Deficiency | Additional Comments | Source(s) | Disputed |
|----|-----------|---------------------|-----------|----------|
| S1 | Failure to Pass Acceptance Tests | Acceptance tests sanctioned by A360 included performance metrics associated with throughput and availability. Availability tests sanctioned by A360 did not meet test targets. | Bastian Dep. Ex. 45, 70, 74, 75, 125, 127, 129, 130; ATTA_0015469–71; ATTA_0016460–64; ATTA_0080588–90; BASTIAN_0012675–77; BASTIAN_0096267; BASTIAN_0096273; | Partially |
| S2 | Failure to Operate Nest with 50 Ants | Failure to operate at production throughput and availability with 50 Ants in the Nest. | Bastian Dep. Ex. 31, 64, 79, 89, 95, 122, 125, 127, 128, 129, 130, 140, 142, 143; Logan Dep., p17:4-8; ACCBAS00040706; ATTA_0016377–79 | No |
| S3 | Inhibited Throughput | Reports of inhibited throughput. | Roark Dep. Rough, p146:18-p147:5; Bastian Dep. Ex. 85, 120, 123, 128, 140; ACCBAS00028960; ACCBAS00030890; | Partially |
| S4 | Generic Nexus Issues | Nondescript, but undesirable Nexus behavior. | Roark Dep. Rough, p55:9-18; Bastian Dep. Ex. 120, 125, 128; | Partially |
| S5 | Product Inaccessibility | Frequent (i.e. daily / weekly) product inaccessibility within the Nest because of one or more columns in state of disrepair or blocked. | Roark Dep. Rough, p104:8-16; Roark Dep. Rough, p118:6-17; Roark Dep. Rough, p128:24–p129:2; Bastian Dep. Ex. 92, 125, 135; ACCBAS00030980; ACCBAS00030890; ACCBAS00040706; | No |
| S6 | Workstation Anomalous Events | Anomalous and disruptive events at Induction and/or Pick stations include being in an inoperative or inhibited. | Roark Dep. Rough, p55:9-18; Bastian Dep. Ex. 17, 59, 72, 81, 82, 86, 87, 95, 120, 125, 139; ACCBAS00028960; ACCBAS00030980; ACCBAS00030890; ACCBAS00040706; | No |

| | | | | |
|---|---|---|---|---|
| **S7** | Required System Restart/Reboot | Frequent system reboot required. System recovery from anomalous state facilitated by full system reboot (e.g. restarting Nexus). This remediation method causes undesirable delay (approx. 5 minutes), detrimentally impacting productivity. | Roark Dep. Rough, p110:10-23; Roark Dep. Rough, p147:15–p148:2; Bastian Dep. Ex. 31, 81, 82, 84, 89, 92, 95, 124, 125, 127, 139; ACCBAS00028960; ACCBAS00030980; ACCBAS00030890; ACCBAS00040706; | No |
| **S8** | Nest Failure | Nest wholly inoperative (i.e. "Nest down", "Nest Crash"). | Bastian Dep. Ex. 17, 69, 76, 81, 84, 87, 95, 124, 125, 126, 127, 129, 130; ACCBAS00030980; ACCBAS00030890; ACCBAS00040706; | No |
| **S9** | Missed pick | Missed cycle counts | Bastian Dep. Exs. 92, 135; ACCBAS00030890; | No |
| **S10** | Ants Failing to Queue | Ants not queuing at workstation lanes. | Bastian Dep. Ex. 94, 121, 126, 140; ACCBAS00030890; | No |
| **S11** | Ant Disrepair Exceeds Repair | The rate at which Ants were pulled from service because repairs were required could exceed the rate Ants could be repaired and returned to service. | Roark Dep. Rough, p161:21-p162:1; Roark Dep. Rough, p182:8-15; Roark Dep. Rough, p213:22–p214:2; Bastian Dep. Ex. 20, 31, 32, 77, 122, 128; | No |
| **S12** | Ants Trapped at Pick Station | Ants in Pick Station queue are trapped (i.e. immobilized) during events when Ant ahead in queue fails. That is, working Ants could not be rerouted without intensive manual intervention This circumstance inhibits the pick process. | Roark Dep. Rough, p142:16–p143:12; Bastian Dep. Ex. 16, 18, 31, 81, 121, 127, 129, 130, 135; ACCBAS00030890; | No |
| **S13** | Dead Ants | Stuck, immobile, or otherwise unresponsive Ant, possibly due to power depletion. | Roark Dep. Rough, p55:9-18; Roark Dep. Rough, p176:22-25; Bastian Dep. Ex. 16, 18, 31, 81, 121, 127, 129, 130, 135; ACCBAS00028960; ACCBAS00030980; ACCBAS00030890; ACCBAS00040706; | No |

| | | | | |
|---|---|---|---|---|
| **S14** | Stuck Ants | Ants can get wedged/stuck in Nest due to mechanical interference. | Roark Dep. Rough, p72:3-14; Bastian Dep. Ex. 122, 135, 135.1-2; ACCBAS00030890; | No |
| **S15** | Ants "Going Rogue" | Weekly frequency of Ant crashing into other Ants due to motor failure or failure to acquire mark. Can result in cascading Ant crashes. | Roark Dep. Rough, p107:7-25; Roark Dep. Rough, p108:12-p109:18 (referencing Video Ex. 134.1); Roark Dep. Rough, p111:7-12; Bastian Dep. Ex. 81; | No |
| **S16** | Ant Falls | Daily frequency (5-8 times/day) of Ants falling while traveling vertically in Nest columns (Z travel). Catastrophic damage to Ants, Nest columns, and/or Nest bins requiring replacement of column railings, replacement of bins, and rebuilding of robot. | Roark Dep. Rough, p72:3-14; Roark Dep. Rough, p102:4-9; Roark Dep. Rough, p103:11-15; Roark Dep. Rough, p104:8-16; Roark Dep. Rough, p127:8-22; Bastian Dep. Ex. 18, 31, 80, 89, 122, 135, 135.1, 137, 141; ACCBAS00030980; ACCBAS00030890; | No |
| **S17** | Ant Derailment | Daily frequency of Ants derailing and possibly crashing while traveling on the Nest attic or basement (X-Y travel). | Roark Dep. Rough, p55:9-18; Roark Dep. Rough, p95:12-14; Roark Dep. Rough, p98:1-5; Roark Dep. Rough, p104:17–p105:3; Roark Dep. Rough, p105:15-18; Roark Dep. Rough, p119:14-16; Roark Dep. Rough, p164:7-8; Bastian Dep. Ex. 17, 18, 20, 80, 82, 94, 95, 122, 125, 135, 140, 141; ACCBAS00030980; ACCBAS00030890; ACCBAS00040706; | No |
| **S18** | Ant Collisions | Incidents of Ant collisions. | Roark Dep. Rough, p107:7-25; Roark Dep. Rough, p108:12-p109:18 (referencing Video Ex. 134.1); Bastian Dep. Ex. 17; | No |
| **S19** | Ant Communication Failure | Communication between Nexus and Ant fails or is otherwise faulty. | Bastian Dep. Ex. 125; ACCBAS00030980; ACCBAS00030890; ACCBAS00040706; | No |

## 4    Response to Dr. Du's General Comments

36. Despite not disputing the vast majority of the opinions from my April Report, Dr. Du asserts certain opinions that I have not previously seen described in discovery responses from Attabotics. I

addressed allegations Attabotics made about Bastian and A360 during discovery in Section 7 of my April Report, and address Dr. Du's general comments in this section.

### 4.1    Attabotics Cube Storage Matrix Approach is Not Advantageous

37.    Dr. Du describes Attabotics' storage capacity as was described in my April Report. Specifically, Dr. Du acknowledges that the Attabotics system is a "cube storage matrix" [Du Report at 2] with "several vertical channels (columns) for Attabotics Robots (Ants) to access bins." [*id*] Dr. Du then explains that "All items were stored in Bins which were stacked next to and on top of each other like building blocks within an aluminum or steel Grid (Nest cell)." [*id*] Dr. Du then explains "Ant robots moved horizontally on the top (ceiling) of the matrix along the grid track, or drove vertically down into open "wells" (columns) to retrieve and deliver Bins to Exports (warehouse workstations) as directed by the onboard control system. Each well allowed an Ant to access the four bins on each level) as shown in Figure 4. A360 operators accessed the inventory at work stations for order fulfillment or stock replenishment. Robots then collected the Bins to return to the Grid." [*id*]

#### 4.1.1    *Attabotics Bins Are <u>Not</u> "stacked…like building blocks"*

38.    Dr. Du inaccurately states that the "Bins" are "stacked…like building blocks". In fact, the bins are not stacked. Rather, the Attabotics bins are placed on shelves, with sufficient clearance around each bin to accommodate the following: i) a linear-actuated conveyor that protrudes from the Ant, under the bin to push the bin into the shelf or pull the bin from the shelf on to the Ant's turret. [April Report, ¶ 24]; ii) space between the top of the bin and the bottom of the shelf above to allow the bin to move into and out of the shelf without interference; and, iii) space between each side of the bin and adjacent shelf walls and/or adjacently-shelved bins to permit the bin to be moved into and out of the shelf without interference.

39.    Because the bins are placed into and on dedicated shelves without touching, much less resting on, each other, the Attabotics bins are not "stacked". Dr. Du seems to confuse the Attabotics storage system with the AutoStore and Ocado storage systems. Unlike the Attabotics shelf-based storage system, AutoStore and Ocado's bins are, actually, "stacked…like building blocks."

#### 4.1.2    *Attabotics Does <u>Not</u> Have a Higher Storage Capacity than AutoStore*

40.    Dr. Du provides a confusing comparison between Attabotics' and AutoStore's bin storage capacity. It seems that Dr. Du's analysis conflicts with prior Attabotics statements and volume equations. Specifically, Dr. Du states that ███████████████████████ ████████████████████████████████████████ ██████████████████ As a comparison, AutoStore's planar storage, for the same 97.5' x 52.3' floor area and the same Bin size, can only hold about 1,200 Bins. The cubic storage

model that Attabotics used is the new industry standard in today's high-tech warehouse." [Du Report at 8]

41. First, Dr. Du does not cite to any sources that substantiate the notion that Attabotics is the new industry standard in today's high-tech warehouse.

42.

43.

---

[2] (Dr. Du's calculated ratio 29.2) ÷ (Attabotics' calculated ratio 0.81) = 36





45. More importantly, however, these dimensions significantly contradict Dr. Du's storage capacity estimates, and refute Dr. Du's statement that Attabotics' cubic storage model "is the new industry standard in today's high-tech warehouse." It is not.

### *4.1.3    Attabotics is Not the New Industry Standard in Today's High-Tech Warehouse*

46. Attabotics has portrayed itself as a leader and innovator in the ASRS space[3] while acknowledging that AutoStore (and Ocado) is (are) the ASRS benchmark.[4] Industry surveys show that Attabotics is three orders of magnitude *smaller* than AutoStore, despite Attabotics being founded in 2016, and raising approximately $165M in capital. See the table below where + means "more" or "higher",–means "less", green means "better", and red means "worse".

#### Cube Storage: Market Overview & Comparison

| | AutoStore (Benchmark) | Attabotics | Blue Robot | PowerCube | Intellistore | Template | Volume Dive |
|---|---|---|---|---|---|---|---|
| Level bots operate on | Top | All | Top (Gantry) | Bottom | Top and Bottom | Bottom | Top and In Between |
| Complexity of Technology | o | + | - | + | + | o | + |
| Maturity of Technology | + | - | + | o | - | - | - |
| Sensitivity to ABC Distribution | + | - | + | + | - | + | - |
| Order Lead Time | + | - | + | + | - | + | - |
| Sensitivity to Floor Unevenness | + | - | + | - | - | - | - |
| Financial Stability | + | o | - | + | o | - | o |
| No. of Installations | > 1.200 | < 10 | < 5 | < 5 | < 5 | < 5 | < 5 |

https://www.beer-management.de

47. Other sources also refute the notion that Attabotics is the "new industry standard in today's high-tech warehouse." For example, ABI Research states that AutoStore, Alert Innovation, and Swisslog are the market leaders in micro-fulfillment ASRS, and generously calls Attabotics "mainstream", because it is a startup with seemingly promising technology.[5] Brittain-Ladd ranks AutoStore as the 2nd-best micro-fulfillment solution on the market in 2022, and ranks Attabotics 7th.[6] Tech Investments calls AutoStore "a leader in robotics and automation" and states that "[t]here are two other small competitors offering a cubic solution, Ocado and Attabotics, but they have only around 2% of the number of installations compared to Autostore." [7]

48. Dr. Du's statement that Attabotics is the new industry standard lacks support.

---

[3]    https://www.retaildive.com/spons/5-reasons-why-vps-of-supply-chain-should-be-investing-in-an-asrs-solution/686977/

[4]    https://www.beer-management.de/en/cube-storage-systems-market-overview/

[5]     https://www.prnewswire.com/news-releases/autostore-alert-innovation-and-swisslog-are-the-market-leaders-in-abi-researchs-micro-fulfillment-asrs-vendor-competitive-ranking-301513194.html

[6]    https://brittainladd.com/what-is-the-best-micro-fulfillment-solution-on-the-market/

[7]    https://www.techfund.one/p/robotics-and-automation-episode-i

**5    Response to Dr. Du's Opinion 1: The Attabotics ASRS v4 was Not a Prototype But a Matured and Industrial-Grade System. Both Its Hardware and Software Utilized State-of-the-Art Technologies**

**5.1    Dr. Du Lacks Relevant Industry Experience**

Dr. Du states that she has "knowledge, education, experience, training, and skillset [sic] that [she has] accumulated over [her] 25 years education career and over 30 years engineering profession in **this engineering field**." [Du Report at 4, (emphasis supplied)] But, based on my review of her report and curriculum vitae, it appears to me that Dr. Du lacks industry experience. In my opinion, Dr. Du's lack of industry experience invalidates statements like, "The Attabotics ASRS v4 robots were not a prototype but a mature, well-developed system. Both the hardware and software utilized state-of-the-art technologies, commonly accepted (in industry) and practically proven technologies." [Du Report at 5, 7]

As a secondary matter, Dr. Du's experience, while laudable for a teaching professor at a non-PhD granting institution, indicates significantly below-average research funding ($1.6M over 20 years). This indicates that Dr. Du has received approximately $80,000 per year in research funding, compared to $230,000 per year on average for her 224 San Jose State University faculty peers. This is particularly confusing because Dr. Du's purported expertise is in robotics, which has been a hotbed of funded research and development for decades.[8]

**5.2    Dr. Du Seems to Not Understand the Term "Prototype" As Used in Industry**

Dr. Du then claims, "In my 25 year professor career and over 30 year engineering profession, I have seen many prototypes." [Du Report, p 7] This is understandable, since "prototypes" are the norm in early stage research, like the programs Dr. Du catalogs in her CV. In fact, it is entirely possible that a professor would *only* see prototypes during their career due to a lack of industry experience. Despite this, Dr. Du states:

> "Prototypes are the early samples or models built to test or prove a concept. The ASRS v4 already had its precedents, the ASRS V1 through V3. At the time it was delivered to A360 at Olathe, KS, through examining its design, layout, structure, components, and the associated programs, The ASRS was an industrial grade system, and it was far beyond just a "prototype". Figure 4 (a) shows the industrial-grade Attabotics ASRS v4 control board, and Figure 4 (b) shows a typical prototype control board. Figure 5 shows a "professional look" of the Ant Robot v4 built to meet industry standards." [*id*]

---

[8]    https://www.sjsu.edu/researchfoundation/about/annual-report.php





52. Dr. Du relies heavily on non-indicative aesthetics to support her opinion, ignoring terms like "breadboard prototype" (e.g., the 1990's-vintage perf board with wire-wrap and DIPs in sockets, shown in upper right of her Figure 4), "alpha prototype", "beta prototype", and "pilot prototype". These are defined below[9] and used across many engineering standards:

    a. **Design Prototyping** is the first stage where concepts are put to paper, designed/simulated on a computer. Design prototypes may be revised multiple times until it validates the concept and evidences scalability.

    b. **Alpha Prototyping** is refining the idea or concept without wasting much time developing an expensive or detailed prototype. In the Alpha Phase, the design is refined to incorporate the learnings from proof-of-concept evaluations, to seek out the best alternatives among the many ways most devices can be built, and to explore the many tradeoffs inherent in any design. Breadboard prototypes, like that shown in Dr. Du's Figure 4(b) [Du Report at 7]

---

[9] https://www.devicelab.com/blog/what-is-the-difference-between-a-prototype-and-an-alpha/

are fashioned in whole or part with basic mechanical assemblies or electronic components on perforation boards (also known as "perf board").

c. **<u>Beta Prototyping</u>** is when the idea's feasibility is tested by creating functional prototypes that will help developers gauge the interest in the product or service. In the Beta Phase, the design incorporates features that aren't necessary during earlier evaluations, like shielding, environment proofing, and safety features. Prototypes are built that combine functions that may have been demonstrated separately during Alpha. Details like assembly breakdowns, fastening methods, the system block diagram, and software division of labor are decided upon and evaluated with Beta Prototypes. Material selection and packaging design are begun. The design is reviewed for manufacturability, and any issues are addressed prior to tooling start. Dr. Du's Figure 4(a) may easily be a beta prototype. [*id*]

d. **<u>Pilot Prototyping</u>** focuses on perfecting the detailed prototypes to test before manufacturing the final product. Each stage is crucial in developing a prototype because each step offers new opportunities for refinement based on testing or customer feedback. With pilot prototypes, the goal is to create something close enough to the final product that it accurately tests consumer reactions before spending money mass-producing it. Dr. Du's Figure 4(a) may easily be a pilot prototype. [*id*]

53. Unfortunately, Dr. Du seems to either not understand or not acknowledge that even a finished-*looking* PCB, which she alleges is shown in the upper left of her Figure 4, is still a prototype if it does not function properly or stably. My industry experience in aerospace, robotics, automation, sensors, SaaS, and related fields has shown me that an assembly, no matter how functional or polished it may seem, is still a (pilot) prototype until it passes all qualification test procedures (QTP), passes all acceptance test procedures (ATP), is in full compliance with all applicable regulatory standards, has met all functional and throughput requirements, and has survived all pertinent environmental and endurance conditions. It does not matter how many iterations are required, a system is a "prototype" until it completes this progression, which Attabotics' products did not.

54. In my April Report, which I incorporate by reference, I listed numerous examples where Attabotics' v4 Ants and Nest system continued to lack product refinement throughout the installation process, and I provided numerous examples of unfavorable Attabotics ASRS behavior in reviewing the body of produced documents for this case. Further evidence of the low-performance of the v4 Ant is shown in an email from Matthew Thorp to Bastian and Attabotics colleagues that acknowledged that "The Version 4 (v4) was an improvement over the V3 robot…but still contained performance deficiencies." [Bastian Dep. Ex. 117]. As an additional reminder, performance deficiencies include, but are not limited to, 75 total failures over 43 operational days, additional disruptions, etc. [April Report, ¶¶ 40-47] This is not the performance of a refined, ruggedized product; it is typical of a beta or pilot prototype system.

27

**5.3     The Attabotics ASRS is not a Matured and Industrial-Grade System**

55.   Dr. Du asserts without objective evidence that the Attabotics ASRS v4 "is not a prototype but a matured and industrial-grade system" [Du Report at 7]. As articulated in my April Report and above, I disagree with this characterization.

56.   In addition to the reasons set forth in Sections 5.1 and 5.2, it is my opinion that Dr. Du mischaracterizes the qualities of the Attabotics ASRS on the basis of objective industry best practice and standards that relate to how the maturity of a technology should be classified. One such best practice is based on a metric referred to as a Technology Readiness Level (TRL). This metric was originally developed by NASA to quantify the maturity of flight-related technology. It has since been codified in ISO Standard 16290, and its use expanded to industrial robotic and material handling applications.

57.   3 provides an overview of a TRL scale adapted to industrial robotic and material handling applications. The scale provides a means by which the maturity of a subject technology or system may be evaluated.

58.   Referring to the Attabotics ASRS, a "matured and industrial-grade" system [Du Report at 7] that is the "new industry standard" [*id*. at p. 8], "meets industry standards" [*id*. at 7], "met A360' needs" [*id*. at 8], and controls the system in a way that is "reliable" [*id*. at 9] would correspond to TRL 9: a Standardized Commercial Product. Attributes of a system at TRL 9 include technology that exhibits robust, reliable, stable, and predictable behavior, and one in which the parts and assemblies have been stabilized (i.e. are not undergoing frequent changes characteristic of a system in development).

59.   Yet, the documented behavior of the Attabotics ASRS is not commensurate with the attributes of TRL 9. For example, there are scores of documented instances of inhibited functionality (see Table 4) that are undisputed by Dr. Du, and scores of documented instances of deficient behavior (see Table 3) that are undisputed by Dr. Du. In addition to the preceding, the reliability of the system was called into question even by individuals employed by Attabotics for example describing the system as having "negative reliability". [Roark Dep Tr. 101:14-15]

60.   Given the prolific documented instances of unreliable behavior and deficiencies of the Attabotics ASRS, it is my opinion that this system is more commensurate with a Technology Readiness Level in the realm of TRL 5, 6, or 7, or indicative of a large-scale laboratory test or a demonstrative system.

| TRL | Stage | Description | Artifacts |
|-----|-------|-------------|-----------|
| TRL 0 | Idea | Unproven concept, no testing, hardware, or models physical, analytical, or simulated. | • Idea |
| TRL 1 | Basic Research | No experimental proof available. Start of scientific research. | • Paper Studies |
| TRL 2 | Application Concept | Application concept is created. Performance is still speculative. | • R&D program or project<br>• Application concept description and functionality |
| TRL 3 | Applied Reasearch | Analytical and first laboratory tests for proof-of-concept. | • Basic requirements<br>• Analytical models<br>• Testing results<br>• Simulation or experiment |
| TRL 4 | Small Scale Laboratory | Component level testing in laboratory environment. Full technology test. | • Analytical models<br>• Testing results and gaps identified<br>• Component level experimentation |
| TRL 5 | Large Scale Laboratory | System (integrated) level testing in simulated and laboratory environment. | • Analytical models<br>• Testing results and gaps identified<br>• System and interface level testing/ experimentation |
| TRL 6 | Full Prototype | Full prototype system tested in simulated or actual environment. Engineering development of technology to operational level. | • Full requirements developed<br>• Full system tests developed<br>• System testing in simplified environment<br>• Preliminary & critical design reviews conducted |
| TRL 7 | Demonstration System | Full prototype system operating in simulated or actual environment. Final engineering development not complete. | • System in simulated or actual environment<br>• Performance close to expected performance<br>• Completion of FAT |
| TRL 8 | First of a Kind System Deployment | Technology fully proven, engineering complete, operating in actual environment, manufacturing issues solved, engineering development complete. | • Final system, complete and in beneficial production use<br>• Completion of SAT and/or other customer qualification threshold |
| TRL 9 | Standardized Commercial Product | Technology, manufacturing, and engineering leaned for efficient procurement, assembly, commissioning, and deployment. Robust, reliable, stable, and predictable operation. | • Multiple deployments<br>• Standardized and complete engineering drawings, assemblies, etc.<br>• Stabilized versions of parts and assemblies. |

**Figure 3: Technology Readiness Levels for Industrial Applications.**

29

## 6    Response to Dr. Du's Opinion 2: Attabotics' ASRS v4 Met the A360 Requirements and the Industry Standards

### 6.1    The Attabotics ASRS Did Not Meet the Throughput Requirements

61. Dr. Du asserts that the Attabotics ASRS met the A360 requirements, though she fails to identify with specificity which requirements she is referring to [Du Report at 10]. The only requirement that she appears to address in her report is related to throughput. The contract documents recite the obligations related to throughput. In part, these obligations include:

    - Bin presentation per Workstation 116 average bins/hour per workstation for each of 5/8 workstations. [Bastian Dep. Ex. 13 at 5]

    - Completion of throughput tests by August 27, 2021. [*Id.* at 4]

    - Use of v5 Ants. [Bastian Dep. Ex. 12 at 29]

62. As noted above, Attabotics was required to provide 50 v5—*not* v4—Ants that provided an average throughput of 116 bin presentations/workstation, for each of five/eight workstations. This requirement depends from the requirement that the Ants are v5. Because v5 Ants were never delivered, Attabotics failed to satisfy the throughput requirement. [April Report, ¶ 7]

63. Additionally, Attabotics was required to achieve the throughput milestone prior to the Go-Live date of Aug 27, 2021. Even if Attabotics achieved the throughput requirement of 116 bin presentation/workstation using v5 Ants (which they did not), according to Dr. Du, the successful throughput test did not occur until March of 2022–7 months after the contractual Go-Live date [*compare* Du Report at 10 *with* Ex. 13 at 4]. For at least the reason that the throughput test was allegedly completed 7 months late, Attabotics failed to satisfy the throughput requirements.

### 6.2    The Attabotics ASRS Did Not Meet the Availability Requirements

64. Dr. Du asserts that the Attabotics ASRS met the A360 requirements, though she fails to identify with specificity which requirements she is referring to [Du Report at 10]. The only requirement that she appears to address in her report is related to throughput. She does not address any requirements related to availability, nor does she attempt to dispute any of the opinions I set forth in my April Report related to availability.

- Even though Dr. Du does not specifically address requirements related to availability, she does make broad and general statements that include: "The Attabotics ASRS v4 was a reliable and functional system. Its performance and throughput met the industry standards and the **contractual requirements**." [Du Report at 5. Emphasis supplied.] "Attabotics' ASRS v4 Met **the A360 Requirements**. . ." [Du Report at 10. Emphasis supplied.]

65. Dr. Du does not offer any support to substantiate her claim that the Attabotics ASRS met "contractual requirements" or the "A360 Requirements" related to availability. The contract documents recite obligations related to availability, which, presumably, Dr. Du could have opined on. In part, these obligations include: [April Report, p 40]

- Completion of availability tests by August 27, 2021. [Bastian Dep. Ex. 13 at 4]

- Use of v5 Ants. [Bastian Dep. 12 at 29]

- Exhibit 98% availability of all required components; minimum testing duration at least one hour. [Bastian Dep. Ex. 12 at 29; Bastian Dep. Ex. 13 at 5]

66. As noted above, Attabotics was required to use v5—*not* v4—Ants for the availability test. This requirement depends from the requirement that the Ants are v5. Because v5 Ants were never delivered, Attabotics failed to satisfy the availability requirement.

67. Additionally, Attabotics was required to achieve the availability milestone prior to the Go-Live date of Aug 27, 2021. I understand that in an email dated July 21, 2022, a Bastian employee claimed that the Attabotics ASRS passed the availability tests [BASTIAN_0096259], and that this claim is contested by A360 [BASTIAN_0096247]. However, even if Attabotics achieved the availability targets according to the prescribed testing protocol using v5 Ants (which they did not), the alleged successful completion did not occur until July of 2022–nearly 1 year after the contractual Go-Live date. For at least the reason that the availability test was allegedly completed 1 year late, Attabotics failed to satisfy the availability requirements.

### 6.3    Dr. Du's Opinion About Industry Standard ANSI/RIA R15.08 is Irrelevant

68. Dr. Du references standard ANSI/RIA R15.08-1-2020–Industrial Mobile Robots–Safety Requirements–Part 1: Requirements For The Industrial Mobile Robot.

69. As a preliminary matter, I will draw attention to the fact that the cited RIA standard is directed at safety requirements for industrial mobile robots (IMRs). "It describes basic hazards associated with IMRs in an industrial environment, . . . , and provides requirements to eliminate, or adequately reduce, the risks associated with these hazards" [RIA R15.08-1-2020, Sec. 1]. Given that my April Report contained no opinions about RIA R15.08 or opinions related to the safety of the Attabotics ASRS, Dr. Du's opinions about RIA R15.08 do not constitute any argument whatsoever that disputes the opinions contained in my April Report. Therefore, her opinions about RIA R15.08 are irrelevant.

70. Not only is Dr. Du's opinion based on RIA R15.08 irrelevant because it is not directed toward any opinions in my April Report, but her opinions are irrelevant because RIA R15.08 does not apply to ASRS systems like the Attabotics ASRS. For example, RIA R15.08 states that "For the purposes

31

of this document [the Standard] 'mobile' refers to **ground-based systems** that can navigate autonomously within their operating environment; airborne and waterborne systems, and **those mounted on rails**, are out of scope" [RIA R15.08-1-2020, Sec. 1, (emphasis supplied)]. The Ants of the Attabotics ASRS do not fall within the scope of RIA R15.08 for at least the reasons that they are not ground based (they operated entirely within the Attabotics Nest and workstations), and during normal use, they are constrained to travel along vertical and/or horizontal rails.

71. Dr. Du could have, presumably, cited industry standards that are relevant to both the Attabotics ASRS and the opinions of my April Report, but she did not. Relevant standards include, for example, FEM Standard 9.221–Performance Data of S/R-Machines, Reliability and Availability, and FEM Standard 9.222–Standards of the Acceptance and Availability of Installations with Storage/Retrieval Machines and Other Machinery.

72. Dr. Du's opinion that the Attabotics ASRS meets industry standards seems to stem from her suggestions that the Attabotics Ant can be classified as a Type B robot, and therefore also satisfies ANSI/RIA R15.08-1-2020. No other analysis is performed by Dr. Du to arrive at her conclusion. In my opinion, this represents a faulty methodology. In order to conclude that the Attabotics ASRS meets the standard, Dr. Du would first have to establish that the Attabotics ASRS is within scope of the standard, and then demonstrate that the Attabotics ASRS conforms to all applicable requirements set forth in the standard. No such analysis is contained or described in Dr. Du's report.

### 6.4    Attabotics' v4 Ant Wheels Can Touch and Interfere with Each Other

73. Dr. Du states that "[t]he key components in the robot, such as servomotors, tooth belts, cams, gearboxes, sensors, and wheels are all commercially available products that meet the industry standards." [Du Report at 11] Dr. Du seems to not realize or acknowledge that the Ant is a custom design, including many bespoke key components. Dr. Du also does not cite to a single industry standard in reference to these "key components". She also does not seem to realize or acknowledge that even if key components meet an industry standard, the *assembly* may not. Proof of this is found in the "negative reliability" [Roark Dep. Tr. 101:14-15] and overall high failure rate of the v4 Ants, as well as the myriad upgrades attempted by Attabotics, described in my April Report. [April Report, ¶¶ 29-31, 40–42, 44–50]

74. Dr. Du states that "[t]he eight wheels were well laid out. Although compact, there were safe gaps between them, and they **cannot** touch each other (see Figure 8)." [Du Report at 11, emphasis added] Dr. Du is incorrect. During my in-person Ant evaluation, I observed, photographed (see below, annotated with a red circle to indicate the interference), and described in my April Report at least one state of an unmodified Ant where two wheels on opposite sides of a corner touched and interfered with each other. [April Report, p 74]



### 6.5    Dr. Du's Opinions about the Ant Gearboxes Are Irrelevant and Unfounded

75. Among the opinions expressed in my April Report are that the Ant gearboxes are prone to exhibiting deficiencies that include: debris observed in gears, and manufacturing defects related to alignment (see above Table 3, deficiency D5).

76. In her report, Dr. Du does not appear to offer an opinion that explicitly refutes my opinion above or any of my opinions related to the gearboxes. Even though Dr. Du does not explicitly address my opinions about the Ant gearboxes, she does make a broad and general statement: "key components in the robot, such as . . . **gearboxes**. . . are **all commercially available products that meet the industry standards**" [Du Report at 11 (emphasis supplied)].

77. Given that my April Report contained no opinions about the commercial availability of gearboxes or whether or not they meet industry standards, Dr. Du's opinions about the Ant gearboxes do not

constitute any argument that disputes the opinions contained in my April Report. Therefore, her opinions about gearboxes are irrelevant.

78. Not only are Dr. Du's gearbox opinions irrelevant because they are not directed toward any opinions in my April Report, but her opinions about the gearboxes are unsupported. This is because she does not 1) specify which industry standards that the gearboxes purportedly meet, 2) offer any evidence whatsoever that the gearboxes meet those standards, or 3) demonstrate that the standards (whatever they may be) have any relevance to my gearbox opinions.

79. The only standard cited by Dr. Du is RIA R15.08, which she cites in connection with the Attabotics Ant robot. This standard is not applicable to stand-alone gearboxes. And, as I described in Section 6.3, RIA R15.08 does not apply to ASRS systems like the Attabotics ASRS.

### 6.6    Dr. Du's Opinions about the Ant Drive Lift Mechanism Are Irrelevant and Unfounded

80. Among the opinions expressed in my April Report are that the Ant drive lift mechanism is prone to mobility failure. More specifically, there is a single actuator that drives a toothed belt-pully around several gears. It is possible in this arrangement that teeth may be skipped and cause improper track engagement. (see Table 3, above, deficiency D6).

81. In her report, Dr. Du does not appear to offer an opinion that explicitly refutes my opinion above or any of my opinions related to the lift mechanism. Even though Dr. Du does not explicitly address my opinions about the Ant lift mechanism, she does make a broad and general statement: "key components in the robot, such as . . . **tooth belts**. . . are **all commercially available products that meet the industry standards**" [Du Report at 11, (emphasis supplied)].

82. Given that my April Report contained no opinions about the commercial availability of toothed belts or whether or not they meet industry standards, Dr. Du's opinions, presumably related to the Ant lift mechanism, do not constitute any argument whatsoever that disputes the opinions contained in my April Report. Therefore, her opinions, if any, about the Ant lift mechanism are irrelevant.

83. Not only are Dr. Du's tooth belt opinion irrelevant because it is not directed toward any opinions in my April Report, her opinions about the tooth belts are also unsupported. This is because she does not 1) specify which industry standards the tooth belts purportedly meet, 2) offer any evidence whatsoever that the tooth belts meet those standards, or 3) demonstrate that the standards (whatever they may be) have any relevance to my opinions about the Ant lift mechanism.

84. The only standard cited by Dr. Du is RIA R15.08, which she cites in connection with the Attabotics Ant robot. But, this standard is not applicable to tooth belts. And, as I described in Section 6.3, RIA R15.08 does not apply to ASRS systems like the Attabotics ASRS.

34

**6.7    Dr. Du's Opinions about the Ant Wheel Synchronization Are Irrelevant and Unfounded**

Among the opinions expressed in my April Report are that the Ant system exhibits deficiencies related to wheel synchronization for vertical travel. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ .

In her report, Dr. Du does not appear to offer an opinion that explicitly refutes my opinions above or any of my opinions related to wheel synchronization. Even though Dr. Du does not explicitly address my opinions about the wheel synchronization, she does make a broad and general statement: "The technique that Attabotics used for **the eight motors' synchronization also met the industry standard**.██████████████████████████████████████████████████████████████████████████████████████████████ [Du Report at 12, (emphasis supplied)].

Given that my April Report contained no opinions about whether or not the synchronization technique used by the Ants met industry standards, Dr. Du's opinions related to Ant wheel synchronization do not constitute any argument whatsoever that disputes the opinions contained in my April Report. Therefore, her opinions about wheel synchronization are irrelevant.

Not only are Dr. Du's wheel synchronization opinions irrelevant because they are not directed toward any opinions in my April Report, her opinions are also unsupported. This is because she does not 1) specify which industry standards the wheel synchronization technique purportedly meets, 2) offer any evidence whatsoever that the wheel synchronization technique meets those standards, or 3) demonstrate that the standards (whatever they may be) have any relevance to my opinions about Ant wheel synchronization.

The only standard cited by Dr. Du is RIA R15.08, which she cites in connection with the Attabotics Ant robot. But, this standard is not relevant. As I described in Section 6.3, RIA R15.08 does not apply to ASRS systems like the Attabotics ASRS.

Moreover, despite Dr. Du's assertion that the motor synchronization technique "met the industry standard," and used various sensory equipment to "adjust each wheel's speed. . . to achieve synchronization," she fails to reconcile her assertion with the scores of documented instances of robots crashing in the vertical shafts of the Nest (see generally, Table 4).

**6.8    Dr. Du's Opinions about the Capacitor Bank Are Irrelevant and Unsupported**

Among the opinions expressed in my April Report are that there are inherent limitations to using a capacitor power bank. ████████████████████████████████████████████████

92. In her report, Dr. Du does not appear to offer an opinion that explicitly refutes my opinions above or any of my opinions related to the inherent limitations of capacitor power. Even though Dr. Du does not explicitly address my opinions, she does make a broad and general statement: "The capacitor bank voltage level was monitored using a voltage regulator. Whenever the capacitive voltage drops below 80 V, the microcontroller instructed the robot to move to the charge station" [Du Report at 12].

93. As a preliminary matter, I point out that Dr. Du does not provide any support for her claim. Additionally, Dr. Du offers no opinion to reconcile or address the numerous documented instances of immobilized Ants recorded in Table 4, S14 with her, apparent, assertion that the Ants do not experience complete depletion of power.

### 6.9 Dr. Du's Opinions about the Nest Structural Defects Do Not Dispute My Own

94. (see Table 3, above, deficiency D15).

95. Dr. Du asserts that "Laser alignment and adjustable feet were used to check straightness and squareness" [Du Report at 12]. This opinion does not dispute in any way my own opinion that the Nest exhibited out-of-square qualities. I concede that Dr. Du is correct insofar as, at some point in time, equipment was used to check the straightness and squareness of the structure. I point out that Dr. Du does not assert that the Nest was actually square and straight, only that equipment was used to check straightness and squareness.

## 7 Response to Opinion 3: Attabotics' Nexus Software Supports the ASRS with the Required Functions

### 7.1 Dr. Du Does Not Address My Analysis of Software Defects

96. With respect to Dr. Du's Opinion 3, "the Nexus software developed by Attabotics supports the ASRS with the required functions," I disagree with her assessment.

97. As an initial matter, I note that Dr. Du did not directly address my analysis related to software defects in my April Report. Although some of Dr. Du's assertions overlap with opinions set forth in my opening report, she does not address my arguments, evidence, or analysis.

98. As a brief summary of my analysis of Attabotics Software in my opening report, I gave my opinion that there were significant issues with the software including at least:

a. Attabotics software could not operate in a "black box" format, requiring Bastian to change their software integration to make up for the deficiencies.

b. Changes in firmware (software) that caused Ants to fall out of the nest.

c. Deficient throughput due to software failures.

d. Software issues with Ant routing, collisions, and communications errors.

e. Nearly daily software errors resulting in problematic reboots, workstation crashes, and/or ant failures.

f. Scalability issues that prevented the system from handling more than approximately 30-40 Ants.

g. Memory leaks.

h. Insufficient testing.

[April Report, ¶¶ 28-54].

99. Dr. Du's report does not address any of this analysis. None of the sources cited or data analyzed is discussed, evaluated, or contradicted.

100. Moreover, in my April Report, I discussed the software issues associated with multiple components of the Attabotics system: the Nexus software, software running on the Ants, and the Attabotics interface software. [April Report, ¶ 28]. Dr. Du, however, only discusses the Nexus software. [Du Report at 12].

101. Instead, Dr. Du makes her own assertions about the "quality" of the source code and the software. Dr. Du asserts, for example, that she reviewed 14,627 pages of Nexus source code and was "impressed" with how well "the codes were written." Moreover, she opines, "[the code] not only supported all the functions of the ASRS, but also considered many possible situations." [Du Report at 12].

102. The 14,627 pages in question were also not provided to me until June 17, 2024 after 6 p.m. EDT. Because of the limited time available, I have not been able to independently analyze this code in any detail. Thus, my analysis is focused on Dr. Du's arguments and evidence provided relative to Opinion 3. I further reserve the right to analyze and opine the code in greater detail at a later date.

103. Based on my review of her report, I disagree with Dr. Du's Opinion 3 and find her analysis to be incomplete, incorrect, and fundamentally unsound. To the extent there is any methodology to her

analysis at all, it is not scientifically valid. Even if it were, there is almost no supporting evidence of any kind and the limited analysis Dr. Du provided is factually wrong.

104. To support her opinion that "the Nexus software developed by Attabotics supports the ASRS with the required functions," Dr. Du appears to rely on three tests.

   a. First, an assertion that, after reviewing 14,000 pages of code, she has identified all required ASRS functionality and it is well-written code. [Du Report at 12].
   b. Second, there is significant code designed to make the system perform effectively with Ant route planning, Ant status monitoring, and so forth. [Du Report at 13].
   c. Third, in response to memory management concerns about Bastian, Dr. Du reviewed the Attabotics code and concluded that it included memory leak management components. [Du Report at 14].

105. To the extent that this represents a methodology to support the proposition of Dr. Du's Opinion 3, it is invalid. The apparent methodology suffers from multiple deficiencies.

**7.2    Dr. Du Uses Invalid Methodology in Examining the Nexus Code**

*7.2.1    Dr. Du Fails to Define the Problem*

106. The first problem with Dr. Du's approach to supporting her opinion is that she does not make any attempt to define the problem with any degree of specificity or clarity. There is no analysis of what "the required functions" of the ASRS are. She provides no list of required functions, nor does she even provide an example of what one of the required functions is. Without any attempt to clearly define what these required functions are, Dr. Du's opinion cannot be validated. There is no way to test and confirm such a vague and nebulous definition.

107. Moreover, there is a dispute between the parties as to what is required of the ASRS software. For example, as discussed in my opening report, Bastian asserts that the Attabotics software was contractually obligated to support up to 50 ants. Attabotics' documentation and Attabotics' witnesses all confirm that the software could not support that many. Dr. Du does not even state whether she believes that this is part of the "required functions", or whether the Attabotics software needed to scale to these numbers. [April Report, ¶¶ 50-52].

108. In another example, in my opening report I identified that Bastian had to modify their software to make up for deficiencies in the Attabotics software. For example, Bastian noted that Attabotics software was not able to track order status and Bastian had to update their system and revise the FSD to include information for Attabotics related to tracking inventory and redirection to the QC lane. [April Report, ¶¶ 37-38]. Dr. Du does not evaluate anything related to the FSD, whether Attabotics lived up to their requirements under the FSD, or whether or not this is part of the "required functions."

### 7.2.2    Dr. Du Provides Incorrect Types of Evidence

109. The second problem with Dr. Du's methodology is that the types of evidence provided are not the right types of evidence for supporting her opinion. The relevant question about whether or not Attabotics supported required functions is a question about the dynamic runtime operations of the system. That is, Dr. Du's opinion relates to the actual performance of the system under real-world operations. However, all of the evidence set forth by Dr. Du in support of this opinion is a static analysis of the source code. While static analysis is sometimes used in providing insights about how the code might behave while running, is insufficient to answer questions about how often the system crashed, how serious the memory leaks were, or even if any of the source code worked. For example, the source code might include functionality for "routing" ants, but only under real-world tests can one determine how well the routing works.

### 7.2.3    Dr. Du's Static Code Analysis is Invalid and Incomplete

110. Third, even if Dr. Du had clearly defined the problems to be tested and even if static code analysis were dispositive, the approach Dr. Du has taken to static code analysis is invalid and woefully incomplete.

111. For example, Dr. Du appears to suggest that the Attabotics source code "looks good," as if that were some kind of reasonable test. She states, "I was impressed how well the codes were written." She also states that the code is "long" and "well-thought-out." [Du Report at 12]. However, these observations are worthless in analyzing the quality of the code. In terms of testing and supporting Opinion 3, being "impressed" does not account for much. And whether the code is long or short is not indicative of whether or not it is correct, and "well-thought-out" is not even a measurable characteristic.

112. Although there are accepted approaches and concrete ways of measuring source code, Dr. Du provides no such evaluation or analysis. In fact, all of Dr. Du's analysis about the Attabotics code appears to be related to what it is supposed to do rather than any analysis of what it actually does. For example, she states that "Many 'smart' codes are related to improve the ASRS's efficiency, including best route…" [Du Report at 13]. However, there is no evidence or discussion of whether or not the Attabotics code achieves this goal. Dr. Du provides no support, nor even claims, that the Attabotics code works correctly.

### 7.3    Dr. Du's Evidence and Analysis are Minimal

113. Beyond problems with methodology, Dr. Du's evidence and analysis are so minimal that there is very little one can determine about the Attabotics software in any event. Dr. Du cites to approximately 60 lines of source code across three files. There is almost nothing related to actual functionality or algorithms as many of the lines are just set-up or boiler-plate code. It is not even clear how Dr. Du's first source citation from ███████████████ which is presumably

meant to show "well-thought-out code," supports that proposition. There is nothing particularly significant about this code that would show that something is "well thought out." Most of the lines are defining what are known as "magic numbers," which are just fixed values that will be used in calculations. ███████████████████████████████████████████ ██████████████████████████████████████████████ Defining magic numbers is a very basic operation in source code and hardly indicative of any kind of "well-thought-out" code.

114. Even more problematic, Dr. Du appears to be analyzing either one of or both versions v.0.40.2 and v.0.44. [ATTA_0144783-158342 and ATTA_0158343-0172969]. Version 0.44 was never used by Bastian and A360, and Version 0.40.2 was released on May 24, 2022 [see ATTA_0016327], long after Attabotics was contractually obligated to provide a system that would be available 98% of all operating hours. Thus, Dr. Du's analysis, as invalid and incomplete as it is, does not even review the relevant source code delivered by Attabotics prior to the contractual deadline for "go-live" in November 2021.

**7.4    Dr. Du Gets Basic Facts About Memory Management in the Attabotics Code Wrong**

115. Finally, regardless of the problems with methodology or the almost complete lack of relevant evidence, Dr. Du also gets basic facts about her evidence and analysis completely wrong. Specifically, with respect to the supposed memory management in the Attabotics code, Dr. Du completely misstates multiple facts and fundamentally errs in her analysis.

116. For example, Dr. Du states that "malloc" and "calloc" are used for allocating memory in "C" code. [(Du Report, p. 14)].



Dr. Du is wrong that the cited source code is in C and Dr. Du is wrong that malloc and calloc are used in C-Sharp. █████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

117. █████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ Dr. Du appears to believe that this source code is used to manage the allocation and deallocation of data. Creating memory management code is a common solution used by programmers for software written in languages like C that do not have automatic memory management. Memory management code is often needed because invariably

---

[10] https://learn.microsoft.com/en-us/dotnet/api/system.runtime.interopservices.nativememory?view=net-8.0

programmers forget to free up allocated memory, especially in large and complicated software.



But it is true that many large C programs will use some kind of "leak management and [memory] handling" code.



On the contrary, it is related to threads (parts of the program that can execute in parallel) and handles, or identifiers, for threads. Without the rest of the source code, it is not entirely clear what the code is doing ███████████ [Du Report, P. 14] ██████████ In fact, as I stated above, memory management code is generally only used for languages like C where memory allocation is manual. For C-Sharp code, on the other hand, there is built-in memory management and so there is generally not a need for manual memory management.[11]

119. █████████████████████████████████████████████.

120. As stated in my opening report, it was Attabotics' witnesses that mentioned the problem with memory leaks and the problems those leaks caused for scale. [April Report, ¶¶ 51-52]. Dr. Du makes no attempt to explain or analyze this evidence.

121. In summary, with respect to her Opinion 3, Dr. Du did not directly address my analysis about software issue in my opening report, used an invalid methodology, provided almost non- existent evidence that was also largely invalid, and made critical errors in what little analysis was provided.

## 8 Response to Opinion 4: Bastian's Exacta and A360's D365 Software Did not Appear to "Handshake" with Attabotics Nexus Well, Which Could Cause Communication or Missing (Order) Data Problems

### 8.1 Dr. Du's "Handshake" Claim Lacks Relevancy

122. Dr. Du also presents Opinion 4, "Bastian's Exacta and A360's D365 software did not appear to 'handshake' with Attabotics Nexus well, which could cause data (order) missing during communication and data transmission."

---

[11] https://learn.microsoft.com/en-us/dotnet/standard/automatic-memory-management

123. As an initial matter, the relevancy of Dr. Du's opinion is not evident. It is not clear which of the alleged Attabotics software problems Dr. Du believes this handshaking relates to. In my opening report, I mentioned, for example, ants literally falling out of the nest because of software problems. [April Report, ¶ 40]. This kind of issue cannot be related to some kind of "handshake" problem. From my own analysis, missing order data was not even the largest of the problems, given the frequent crashes that would bring the system down for hours, or even days, at a time. [April Report, ¶¶ 44-47].

124. Nevertheless, to the extent that some part of the failures of Attabotics software were related to missing order data, I disagree with Dr. Du's opinion that this is a problem with some kind of handshake protocol.

125. First, I note that Attabotics software does not even interface with A360 software. [April Report, ¶ 31]. Thus, any of Dr. Du's opinions related to communications between A360 and Attabotics software are simply irrelevant. As for Dr. Du's opinions with respect to handshake issues between Attabotics and Bastian, Dr. Du's methodology, as with Opinion 3, is invalid. Moreover, her evidence and analysis for Opinion 4 is even less than for her Opinion 3.

### 8.2  Dr, Du's Methodology in Examining the "Handshaking" Between Attabotics and Bastian is Invalid

126. Dr. Du's methodology, to the extent there is any, is invalid. The entirety of Dr. Du's analysis appears to be a generic statement that handshakes are important, an assertion that some generic handshake protocol was not followed leading to errors for Nexus, and another generic statement about timing data being important. It is exceedingly difficult to call this a "methodology."

127. One reason Dr. Du's methodology is invalid is that she would need to identify if she thinks there is a "handshake" protocol at all and, if so, what it is. From her opinion (i.e., that it did not handshake "well") and her limited analysis (i.e., suggesting that a handshake protocol was not followed), it appears that Dr. Du believes there was some kind of handshake protocol, but. she does not say so explicitly. Perhaps more importantly, she does not provide any details of any kind about what it is, how it works, what is expected of each side of the handshake, and where it is defined.

128. A second failure of Dr. Du's methodology is that she does not quantify or suggest any testable proposition that this alleged failure to follow the handshake had an appreciable impact on not completing orders. For example, even *if* there is a handshake protocol, and even *if* a failure of Bastian to follow this alleged handshake resulted in an incomplete order, Dr. Du would need to quantify the impact. There is no analysis from Dr. Du about how often these failures supposedly occurred, how often orders were corrupted because of them, and what percentage of failures were attributable to the alleged failures of Bastian. In engineering analyses, it is rarely the case that all

42

real-world failures can be attributed to one cause. Correct methodologies for assessing failures quantify how frequently failures are attributable to causes-under-test so that impact can be determined. In short, for Dr. Du to have a valid methodology, she would need to show what real impact this supposed handshake protocol (which she does not define) and failures to follow it (which she does not demonstrate), had on the system.

### 8.3    Dr. Du Provides No Evidence of Bastian or A360 Not Following a Handshake Protocol

129. Without a valid methodology, Dr. Du's opinion is meaningless. But even if her methodology were sound, Dr. Du provides zero evidence; she literally does not cite any evidence in this section of her report. There is no evidence of Bastian or A360 not following a handshake protocol, and there is no evidence supporting the proposition that a handshake protocol caused Attabotics' inability to complete orders (which, incidentally, Dr. Du appears to confirm).

130. Dr. Du uses words such as "could cause" or even handshake "well," but does not show that any problems occurred as a result of an incorrect handshake, or provide any detail about what Bastian and A360 supposedly did not do correctly. She simply states that they did not handshake "well."

131. I note that, although Dr. Du is not clear about what the supposed "handshake protocol" is, there are many things it cannot be. ███████████████████████████████ ████████████ This type of protocol is already built on top of TCP, which has its own handshake protocol. That is, TCP provides a handshake mechanism that ensures that communications between the two devices are not lost and are guaranteed to arrive or will report a communication error. HTTP messages, such as the messages sent between Bastian and Attabotics, are only sent after the handshaking is over and the synchronization established. Thus, the individual communications between Attabotics and Bastian are already synchronized using a handshake protocol.

132. To the extent that Dr. Du is suggesting that there was some kind of application-level handshake, there is no evidence that such a handshake existed or was even requested by Attabotics. As also expressed in my opening report, Bastian invited Attabotics to participate in the development of integration requirements and the creation of the FSD integration requirements. [April Report, ¶¶ 31–38].

133. Furthermore, in my opening report I discussed the communications between Attabotics and Bastian including the diagram previously labeled as Figure 1 in this document. [April Report, ¶¶ 32-36].

134. I do not see any handshake requirements in the FSD and I am not aware of any testimony from Attabotics employees that they asked for a handshake protocol.

135. Similarly, I am not aware of any Attabotics witnesses indicating that Bastian code could not correctly "handshake" with their software. Contrary to Dr. Du's opinions, I set forth in my opening report that Bastian had to adjust their code to make up for failures and limitations in Attabotics' code. Attabotics' software should have been able to handle all of the order fulfillment process as a "black box" without intervention from Bastian. However, Attabotics did not fulfill this design, and Bastian had to modify their code to deal with the limitations of the Attabotics software. [April Report, ¶¶ 37–38]. To the extent there were any issues with meeting design requirements, the evidence points to problems with the Attabotics code, and not Bastian.

## 9   Summary of Opinions

136. Dr. Du's report did not dispute the overwhelming majority of points I made in my April Report. Dr. Du's report also erroneously and exaggeratingly characterized Attabotics cube storage system performance with respect to competitors, like AutoStore, that are actually successful. Dr. Du's credentials and report did not support her conclusion that the Attabotics ASRS v4 was a mature industrial-grade system, much less that its hardware and software utilized stateof-the-art technologies. Dr. Du's report also did not show that the Attabotics ASRS v4 met the A360 requirements or, for that matter, industry standards. Additionally, Dr. Du's invalid methodologies, lack of analysis and seeming lack of understanding about software memory management failed to show that the Attabotics Nexus software supported the A360 ASRS with the required functionality. Furthermore, Dr. Du's invalid methodology, lack of evidence and focus on irrelevant aspects did not show that Bastian's Exacta and A360's D365 software caused handshaking problems, communication errors or missing data.

137. For these and other reasons, my opinions remain as stated in my April Report, and are summarized below:

(1) The software supplied by Attabotics was defective and unreliable, and incapable of functioning in a system of 30+ Ants without repeatedly crashing.

(2) None of the Ants supplied by Attabotics were the v5 Ants promised by Attabotics, and the Nest and v4 Ants actually supplied by Attabotics were defective and unreliable.

(3) The software and hardware supplied by Attabotics was not commercially proven and, in fact, the deficiencies in both bear all the hallmarks of an undisclosed prototype system.

(4) Attabotics' lack of transparency in disclosing systemic issues with its supplied software and hardware contributed to delay and undermine the parties' working relationship.

44

## 10    APPENDIX A–FILES REVIEWED

### 10.1    General Pleadings (Delaware Matter)

1.      A360 Complaint (unredacted version)

### 10.2    General Pleadings (Indiana Case)

2.      011-Bastian-Amended Complaint (1).pdf
3.      011 -1- Ex A (1)-Intergrator Agreement.pdf
4.      011-2- Ex B (1)-03-18-2020 Attabotics Agenda.pdf
5.      011-3- Ex C (1)-Schedule A .pdf
6.      011-4- Ex C-1 (1)-Appendix A .pdf
7.      011-5- Ex C-2 (1)-03-13-2020 Appendix H .pdf
8.      011-6-Ex D (1)-DE Complaint 07-29-2022 Redacted.pdf
9.      026-Bastian-Motion for Summary Judgment.pdf
10.     026-1-Exhibit A-Declaration of M. Logan.pdf
11.     026-2-Exhibit A-1-INTERGRATOR AGREEMENT-06-12-2020.pdf
12.     026-3-Exhibit A-2-System Agreement 12-18-2020.pdf
13.     026-4-Exhibit A-3-schedule A .pdf
14.     026-5-Exhibit A-4-Purchase Order 12-21-2020.pdf
15.     026-6-Exhibit A-5-Attachment H -12-18-2020.pdf
16.     026-7-Exhibit A-6-DE Complaint 07-29-2022-REDACTED.pdf
17.     026-8-Exhibit A-7-08-17-2022 ltr to Gravelle from Q&B.pdf
18.     027-Bastian-Brief in Support of MSJ.pdf
19.     029-Bastian-Preliminary Witness and Exhibit List.pdf
20.     030-Attabotics-Witness and Exhibit Lists.pdf
21.     031-Attabotics Motion to Deny or Defer Consideration of Bastian's Motion for Partial Summary (81458434.1).pdf
22.     032-Attabotics Brief in Support of Motion Under Rule 56(D)(81459278.1).pdf
23.     039-Attabotics Answer to Amended Complaint.pdf
24.     040-Attabotics-Appendix in Support of Attabotic's Response to Bastian's Motion for Summary Judgment with Exhibits.pdf
25.     041-Attabotics-Response to Bastian's Motion for Partial Summary Judgment.pdf
26.     050-Attabotics Surreply.pdf

### 10.3    Deposition and Deposition Exhibits

27.     Roark, John 04-12-24 - Exh 134.1-4.1 ATTA0137167Confidential_Pdf.mp4
28.     Cuddihy, Kelly-03-14-24 - Dickinson, Mark-01-18-24 - Exh 20.pdf
29.     Cuddihy, Kelly-03-14-24 - Dickinson, Mark-01-18-24 - Exh 12.pdf
30.     Cuddihy, Kelly-03-14-24 - Dickinson, Mark-01-18-24 - Exh 21.pdf
31.     Cuddihy, Kelly-03-14-24 - Exh 100-36. ATTA0101952.pdf
32.     Cuddihy, Kelly-03-14-24 - Exh 101-37. ATTA0070166.pdf
33.     Cuddihy, Kelly-03-14-24 - Exh 87-ATTA0025027.pdf
34.     Cuddihy, Kelly-03-14-24 - Exh 90-2.a. ATTA0067010.pdf
35.     Cuddihy, Kelly-03-14-24 - Exh 91-3. ATTA0078033.pdf
36.     Cuddihy, Kelly-03-14-24 - Exh 92-10. ATTA0066819.pdf
37.     Cuddihy, Kelly-03-14-24 - Exh 93-ATTA0006058.pdf
38.     Cuddihy, Kelly-03-14-24 - Exh 94-ATTA0013005.pdf
39.     Cuddihy, Kelly-03-14-24 - Exh 95-14. ATTA0055720.pdf

40.    Cuddihy, Kelly-03-14-24 - Exh 96-21. ATTA0099063.pdf
41.    Cuddihy, Kelly-03-14-24 - Exh 97-27. ATTA0101923.pdf
42.    Cuddihy, Kelly-03-14-24 - Exh 98-29. ATTA0015962.pdf
43.    Cuddihy, Kelly-03-14-24 - Exh 99-35. ATTA0015911.pdf
44.    Cuddihy, Kelly-03-14-24-full with exhibits.pdf
45.    Cuddihy, Kelly-03-14-24 -Dickinson, Mark-01-18-24 - Exh 2.pdf
46.    LaMaster, Nancy 03-22-24-_Rough.pdf
47.    LaMaster, Nancy 03-22-24-Full with exhibits PDF.pdf
48.    LaMaster, Nancy 03-22-24 Exh 17-Bastian_069026-069242.pdf
49.    LaMaster, Nancy 03-22-24 Exh 18.pdf
50.    LaMaster, Nancy 03-22-24 Exh 19.pdf
51.    LaMaster, Nancy 03-22-24 Exh 20.pdf
52.    LaMaster, Nancy 03-22-24 Exh 21.pdf
53.    LaMaster, Nancy 03-22-24 Exh 22.pdf
54.    LaMaster, Nancy 03-22-24 Exh 23.pdf
55.    LaMaster, Nancy 03-22-24 Exh 24.pdf
56.    LaMaster, Nancy 03-22-24 Exh 25.pdf
57.    LaMaster, Nancy 03-22-24 Exh 26.pdf
58.    LaMaster, Nancy 03-22-24 Exh 27.pdf
59.    LaMaster, Nancy 03-22-24 Exh 28.pdf
60.    LaMaster, Nancy 03-22-24 Exh 29.pdf
61.    LaMaster, Nancy 03-22-24 Exh 30.pdf
62.    LaMaster, Nancy 03-22-24 Exh 31.pdf
63.    LaMaster, Nancy 03-22-24 Exh 32.pdf
64.    LaMaster, Nancy 03-22-24 Exh 33.pdf
65.    LaMaster, Nancy 03-22-24 Exh 34.pdf
66.    LaMaster, Nancy 03-22-24 Exh 35.pdf
67.    LaMaster, Nancy 03-22-24 Exh 36.pdf
68.    LaMaster, Nancy 03-22-24 Exh 37.pdf
69.    LaMaster, Nancy 03-22-24 Exh 38.pdf
70.    LaMaster, Nancy 03-22-24 Exh 39.pdf
71.    LaMaster, Nancy 03-22-24 Exh 40.pdf
72.    Lempa, Tyler 03-20-24 -with exhs Full PDF.pdf
73.    Logan, Marvin 04-05-2024 Full with exhibits.pdf
74.    Needham, Shawn 04-03-2024 Full with exhibits.pdf
75.    Padgett, John 04-11-24-Full with Exhibits.pdf
76.    Richardson, Cyra 03-08-24 - Exh 78-1. A LinkedIn.pdf
77.    Richardson, Cyra 03-08-24 - Exh 79-10. ATTA0080883.pdf
78.    Richardson, Cyra 03-08-24 - Exh 80-14. ATTA0025695.pdf
79.    Richardson, Cyra 03-08-24 - Exh 81-22 2022.03.02 ATTA0004449.pdf
80.    Richardson, Cyra 03-08-24 - Exh 82-23. ATTA0019511.pdf
81.    Richardson, Cyra 03-08-24 - Exh 83-24 2022.03.22 ATTA0025397.pdf
82.    Richardson, Cyra 03-08-24 - Exh 84-27. ATTA0103583.pdf
83.    Richardson, Cyra 03-08-24 - Exh 85-31. ATTA0025068.pdf
84.    Richardson, Cyra 03-08-24 - Exh 86-32. ATTA0016213.pdf
85.    Richardson, Cyra 03-08-24 - Exh 87-34. ATTA0025027.pdf
86.    Richardson, Cyra 03-08-24 - Exh 88-38 2022.07.22 ATTA0124571.pdf
87.    Richardson, Cyra 03-08-24 - Exh 89-40. 2022.09.06 ATTA0103520.pdf
88.    Richardson, Cyra 03-08-24 Full with exhibits.pdf
89.    Richardson, Cyra 03-08-24 Ref - 16. Dickinson Mark 01-18-2024 Exh 27.pdf
90.    Richardson, Cyra 03-08-24 Ref - 1.B Dickinson Mark 01-18-2024 Exh 12.pdf

91. Richardson, Cyra 03-08-24 Ref - 11. DickinsonMark -01-19-2024 Exh 43.pdf
92. Richardson, Cyra 03-08-24 Ref -13. DickinsonMark -01-19-2024 Exh 42.pdf
93. Richardson, Cyra 03-08-24 Ref - 2. Dickinson Mark 01-18-2024 Exh 21.pdf
94. Richardson, Cyra 03-08-24 Ref - 3. Dickinson Mark 01-18-2024 Exh 22.pdf
95. Richardson, Cyra 03-08-24 Ref - 39. Dickinson Mark 01-18-2024 Exh 36.pdf
96. Richardson, Cyra 03-08-24 Ref - 4. Dickinson Mark 01-18-2024 Exh 23.pdf
97. Richardson, Cyra 03-08-24 Ref - 5. Dickinson Mark 01-18-2024 Exh 24.pdf
98. Richardson, Cyra 03-08-24 Ref - 6. Dickinson Mark 01-18-2024 Exh 26.pdf
99. Richardson, Cyra 03-08-24 Ref - 7. Dickinson Mark 01-18-2024 Exh 25.pdf
100. Roark, John 04-12-24 - Exh 31-18. 2022.03.28 - Exh 31-BASTIAN0065244-0065245.pdf
101. Roark, John 04-12-24 - Exh 101-25. 2022.07.10 - Exh 101-ATTA0070166-0070169.pdf
102. Roark, John 04-12-24 - Exh 131-1. John Roark LinkedIn.pdf
103. Roark, John 04-12-24 - Exh 132-2. 2021.06.18 ATTA0068762.pdf
104. Roark, John 04-12-24 - Exh 133-3. 2021.08.12-ATTA0117096.pdf
105. Roark, John 04-12-24 - Exh 134-4. 2021.08.25 ATTA0137166.pdf
106. Roark, John 04-12-24 - Exh 135-5. 2022.01.23 ATTA0005054.pdf
107. Roark, John 04-12-24 - Exh 135.1-5.1 ATTA0005059.pdf
108. Roark, John 04-12-24 - Exh 135.2-5.2 ATTA0005060.pdf
109. Roark, John 04-12-24 - Exh 136-6. 2022.01.30 ATTA0005302.pdf
110. Roark, John 04-12-24 - Exh 137-7. 2022.02.23 - Exh 28-ATTA0070470.pdf
111. Roark, John 04-12-24 - Exh 138-11. 2021.09.15 ATTA0008514.pdf
112. Roark, John 04-12-24 - Exh 139-13. 2021.12.21 ATTA0081273.pdf
113. Roark, John 04-12-24 - Exh 140-14. 2022.01.10 ATTA0055740.pdf
114. Roark, John 04-12-24 - Exh 141-15. 2022.01.14 ATTA0070828.pdf
115. Roark, John 04-12-24 - Exh 142-17. 2022.02.10 ATTA0004562.pdf
116. Roark, John 04-12-24 - Exh 143-20. 2022.03.31 ATTA0003401.pdf
117. Roark, John 04-12-24 - Exh 144-22. 2022.07.25 ATTA0134681.pdf
118. Roark, John 04-12-24 - Exh 32-21. 2022.05.05 - Exh 32-ATTA0070285-0070288.pdf
119. Roark, John 04-12-24 - Exh 36-9. 2022.06.24 - Exh 36-ATTA0016009-0016012.pdf
120. Roark, John 04-12-24 - Exh 92-23. 2021.12.24 - Exh 92-ATTA0066819-0066823.pdf
121. Roark, John 04-12-24 - Exh 95-19. 2022.01.18- Exh 95-14. ATTA0055720-0055726.pdf
122. Roark, John 04-12-24_PDFTran.pdf
123. Rowe, Chuck 03-27-24 with exhbits Full PDF.pdf
124. Thorp, Matt-02-28-24 Full with exhibits.pdf
125. Davison, Mark 04-18-24 _Rough.txt
126. Lempa, Tyler 03-20-24-Rough deposition transcript-ROUGH.txt
127. Roark, John 04-12-24 _Rough (Atta).txt
128. Jones, Aaron 04-23-24 Full w exh

**10.4  Bates referenced in Bastian response to Attabotics 04/15/24 #7 interrogatory:**

129. 2021-09-15-Email from Davison re 09-14-21 catastrophic error shut down of nest-BASTIAN_0070515.pdf
130. ATTA_0012675.pdf
131. ATTA_0012676-0012677.pdf
132. ATTA_0015469-0015470.pdf
133. ATTA_0016377-ATTA_0016378.pdf
134. ATTA_0016379.pdf
135. ATTA_0016460-0016463.pdf
136. ATTA_0080588-0080589.pdf

137.    ATTA_0080590.pdf
138.    ATTA_0015471_Confidential.XLSM
139.    ATTA_0016464_Confidential.XLSM

**10.5   Nicole Schimpf Inspection 04/04/23**

140.    NLS 4-42023 Photos
141.    Overall Videos
142.    Unprocessed Laser Scans

**10.6   ATTABOTICS VIDEOS FROM ATTABOTICS WEBSITE:**

143.    11-20-2020 Attabotics & Microsoft Azure Commercial Marketplace
144.    2024-01-17_13-32-26

**10.7   ATTABOTICS DISCOVERY RESPONSES:**

145.    2023-05-12 - Attabotics - Initial Disclosures
146.    2023-10-30 - Attabotics - Response to Bastian ROGS
147.    2023-10-30 - Attabotics - Response to Bastian ROGS
148.    2023-10-30 - Attabotics - Response to Bastian RFP
149.    2023-10-30 - Attabotics - Response to Bastian ROGS (dep version)
150.    2023-12-08 - Attabotics - Response to Bastian's Rule 30(b)(6) Notice
151.    2024-01-16 - Attabotics - Suppl ROG #18-lists bates range
152.    2024-04-15 - Attabotics Response to Bastian 2nd Set of RFP
153.    2024-04-15 - Attabotics Response to Bastian Inspection Requests
154.    2024-04-15 - Attabotics ROG Responses
155.    2024-04-15 - Attabotics ROG (Signature Page signed by Needham)

**10.8   ATTABOTICS DOCUMENTS PRODUCED:**

156.    ATTA_0000001-ATTA_0143313
157.    Attabotics Doc Prod 04-19-2024 - ATTA_0143314-0144402–OCRD
158.    Expert Report of Professor Winncy Du, PhD, PE, May 20, 2024

**10.9   A360 Documents Produced to Attabotics Subpoena:**

159.    ACCBAS00000001-00045242

**10.10  Bastian Documents Produced:**

160.    Bastian_0000001- BASTIAN_0099410
161.    Janét Report, April 22, 2024

**10.11  BASTIAN DISCOVERY RESPONSES:**

162.    2023-05-12 – Bastian - Initial Disclosures.pdf
163.    2023-08-11 - Bastian - Response to Attabotics RFP.pdf
164.    2023-08-11 – Bastian - Response to Attabotics RFPs-see N drive Everlaw Indiana for production Bastian_000001-0096741.pdf
165.    2023-08-11 Bastian - Written Responses to Attabotics RFPs.pdf

166.    2023-09-15 Bastian Solutions, LLC's Resp. to Attabotics, Inc's 2nd RFP.pdf
167.    2023-12-14 AS-SIGNED VERSION of Bastian-Response to 1st set of Rogs.pdf
168.    2023-12-14 AS-SIGNED VERSION of Bastian-Response to Attabotics 2nd Set of Rogs.pdf
169.    2023-12-14 FINAL Bastian-Response to Attabotics 1st set First Set of RFA.pdf
170.    2023-12-14 FINAL Bastian-Response to Attabotics 1st set of ROGS.pdf
171.    2023-12-14 FINAL Bastian-Response to Attabotics 2nd Set of ROGS.pdf
172.    2023-12-14 FINAL Bastian-Response to Attabotics 3rd set RFP.pdf
173.    2024-01-03 - Bastian - Response & Objections to Attabotics Notice of Rule 30(b)(6) Deposition.pdf
174.    2024-01-09 – Bastian - Partial Response to IRT RFP 3
175.    2024-01-29 - Bastian - Response to ATTA 2nd Set of RFA
176.    2024-03-14 – Bastian - Response to ATTA 4th set of RFP
177.    2024-04-15 – Bastian - Response to Attabotics 3RD Set of ROGS-signed.pdf
178.    2024-04-15 – Bastian - Response to Attabotics 5th set RFP-signed.pdf

## 10.12 Photos

179.    OF Olathe facility photos July 2023

## 10.13 JANET, JASON-03-06-24 to 03-08-24 ANTS INSPECTION DOCUMENTS–PHOTOS, VIDEOS

180.    Photos and videos from Jason Janét inspection of ants at Quarles Indy office

## 10.14 Work Product

181.    Bastian-Key depo exhibits with descriptions (pdf version)
182.    Excel version key depo dates & fsd, & a360 complaint dates-2
183.    Software status reports & punchlists–work product
184.    Excel version key depo dates etc.
185.    2021-09-15-Email from Davison re 09-14-21 catastrophic error shut down of nest-BASTIAN_0070515
186.    2024-04-17 email to experts from dulai with correct bates for punch lists
187.    Bastian_0062178 punch list bates correction
188.    A360 screen shots of CAB from ACCABS document production
189.    04-17-24 to janet from dulai enc photo Bastian RE Ant collision in vertical shaft... ant crash email and photo

## 10.15 SENT ON 04/21/24:

190.    Attabotics Doc Prod 04-19-2024-ATTA_0143314-0144402-OCRD
191.    ATTA_0143321–rash of failures at A360 in Q1
192.    ATTA_0006878_Confidential-site performance metrics 09-14-21 excel
193.    ATTA_0070734
194.    ATTA_0082467-0082468
195.    ATTA_0082468_Confidential spreadsheet
196.    ATTA_0095907
197.    ATTA_0095909 09-03-21 ATTA
198.    ATTA_0095912_Confidential-phase 1 issues

199. ATTA_0095912_Confidential
200. ATTA_0103609-0103649
201. ATTA_0120715-re hivemind
202. ATTA_0133208-commissioning checklist A36011 10-21
203. ATTA_0143382- 08-25-2020 reference smartsheet @ 53884

## 10.16 Standards and Other References

204. *Industrial Robotics: Selection, Design and Maintenance* by Harry Colestock, Copyright 2005, ISBN 0-07-144052-6
205. International Society for Automation Standards, which may include:
    a. Industrial Automation and Control Systems Security (ISA99)
    b. Wireless Systems for Automation (ISA100)
    c. Human-Machine Interface (ISA101)
    d. Procedure Automation for Continuous Process Operations (ISA106)
    e. Intelligent Device Management (ISA108)
    f. SCADA Systems (ISA112)
206. American National Standards Institute (ANSI) Standards
    a. ANSI/RIA R15.08-1-2020
207. Key ISA standards committee references, which may include:
    a. Instrumentation Symbols and Diagrams (ISA5)
    b. Management of Alarms (ISA18)
    c. Instrumented Systems to Achieve Functional Safety (ISA84)
    d. Batch Process Control (ISA88)
    e. Enterprise-Control System Integration (ISA95)
    f. Industrial Automation and Control Systems Security (ISA99)
208. International Organization for Standardization (ISO)
209. Methods Engineering Reference by Krick, Edward V, Publication date 1962
210. Work Design & Measurement, IE Terminology, 2000 Revised Edition
211. Methods, Standards, and Work Design (Eleventh ed.). Freivalds, Andris; Niebel, Benjamin (2003). New York: McGraw-Hill. ISBN 0072468246
212. FEM 9.221-Performance Data of SR Machines-Reliability, Availability
213. FEM 9.222-Acceptance & Availability of ASRS and Other Sys
214. FEM 9.851-Performance Data of SR Machines-Cycle Time
215. IEEE 1012-2004-Standard for Software V&V